(166 App. Div. 425)

### SUMMO v. SNARE & TRIEST CO. et al.

(Supreme Court, Appellate Division, Second Department.   March 5, 1915.)

1. MASTER AND SERVANT ⬤⟹278—ACTION FOR INJURY—SUFFICIENCY OF EVI-
   DENCE—SCAFFOLD.
   In an action for the death of a servant, brought under Labor Law
   (Consol. Laws, c. 31) § 18, requiring a master to furnish safe and proper
   scaffolding, evidence *held* sufficient to sustain a finding of the master's
   negligence in furnishing a scaffolding, the suspending rope of which was
   in a bad condition.
   [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 954,
   956–958, 960–969, 971, 972, 977; Dec. Dig. ⬤⟹278.]

2. MASTER AND SERVANT ⬤⟹297—ACTION—VERDICT—CONFORMITY TO ISSUES.
   Where the complaint alleged that the rope which broke, causing injury,
   "was defective, and was old' and worn out," and the defendant's proof
   was that it was not "old," but comparatively new, a verdict for plaintiff
   was secundum allegata, as the word "defective" sufficiently covered the
   situation.
   [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1195–
   1198; Dec. Dig. ⬤⟹297.]

3. MASTER AND SERVANT ⬤⟹277—ACTION FOR INJURY—SUFFICIENCY OF EVI-
   DENCE—RELATION OF PARTIES.
   Evidence in an action for the death of a servant *held* to show that the
   contractor with a city, and not an alleged subcontractor for the labor,
   was decedent's master.
   [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 953;
   Dec. Dig. ⬤⟹277.]

4. MASTER AND SERVANT ⬤⟹268—ACTION FOR INJURY—EVIDENCE—RELATION
   OF PARTIES.
   Evidence as to the corporate organization of the subcontractor and its
   usual scope of business, which was exclusively confined to the jobs of the
   defendant contractor, who controlled its stock, was admissible upon the
   relation of the parties as affecting liability for injury to servant.
   [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 910;
   Dec. Dig. ⬤⟹268.]

5. MARRIAGE ⬤⟹50—EVIDENCE—VERBAL AGREEMENT.
   In an action for the death of a servant, brought by his administratrix
   and alleged widow, evidence *held* to sustain a finding that decedent and
   plaintiff had become lawful husband and wife by verbal agreement.
   [Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 79–89; Dec.
   Dig. ⬤⟹50.]

6. BASTARDS ⬤⟹12—LEGITIMACY—STATUTES.
   Under the express provision of Laws 1895, c. 531, the previously born
   children of a couple, who after the removal of impediments became by
   agreement lawful husband and wife, were legitimatized.
   [Ed. Note.—For other cases, see Bastards, Cent. Dig. §§ 14, 15; Dec.
   Dig. ⬤⟹12.]

7. TRIAL ⬤⟹146—MISTRIAL—WITHDRAWAL OF JUROR.
   Where six of the jury remonstrated with the court as to the language
   used by defendant's counsel, and declared that they had been insulted
   thereby, counsel was entitled, on application, to a withdrawal of a juror
   and a mistrial.
   [Ed. Note.—For other cases, see Trial, Cent. Dig. § 329; Dec. Dig.
   ⬤⟹146.]

---

⬤⟹*For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes*

Appeal from Trial Term, Westchester County.

Action by Vitacrescenza Summo, as administratrix, etc., of Vito A. Summo, deceased, against the Snare & Triest Company and the Steel & Masonry Contracting Company. From a judgment for plaintiff, and from an order denying their motions for a new trial, defendants appeal. Judgment and order affirmed.

See, also, 154 App. Div. 888, 138 N. Y. Supp. 1145.

Argued before JENKS, P. J., and BURR, CARR, STAPLETON, and PUTNAM, JJ.

Hector M. Hitchings, of New York City, for appellants.

William F. Unger, of New York City (Leonard M. Wallstein, of New York City, on the brief), for respondent.

CARR, J. The plaintiff recovered a verdict for $5,000 for damages for the death of her decedent through the alleged negligence of both defendants. It was a "scaffold case," and the action was brought under the Labor Law. One of the ropes sustaining a scaffold which was being hoisted into place gave way while the decedent was on the scaffold, and he fell to the ground and was killed.

There were three hotly contested issues at the trial, and this appeal is based upon all three, viz.: First, Was there actionable negligence on the part of either defendant? Second. Was the Snare & Triest Company the employer of the decedent? Third. Was the plaintiff the lawful wife of the decedent, and were her children (his also) his legitimate children?

The appeal was argued unusually well by both counsel. The briefs are exhaustive. I will discuss briefly the points of the appellants in their order:

[1] First. Was there proof of actionable negligence on the part of either defendant?

The accident happened on one of the towers of the Pelham Bay Bridge, which was erected under a contract between the city of New York and the Snare & Triest Company. A photograph of the bridge and its towers is to be found in the record. The decedent had been at work, on the day before the accident, cleaning spots of cement from the masonry surface of the tower. An ordinary painter's ladder, with boards over the rungs, was used as a scaffold. The decedent and a helper stood upon these boards. The scaffold was suspended along the side of the tower by a rope looped over its top. It was lowered to the ground at the end of the day's work. Early in the morning of the accident, the decedent and his helper took their places upon the scaffold, and other workmen began to hoist it up into place. At times one end of the scaffold would go up higher than the other during the hoisting process. But, according to the plaintiff's witnesses, the scaffold had reached its proper place and was entirely level when the accident happened.

The plaintiff produced several eyewitnesses, among them De Melia and Erdrono. These witnesses describe the whole occurrence. According to their story, the suspending rope broke, the decedent fell from the scaffold, and the scaffold in its fall struck the decedent as

he lay upon the ground. There is proof by a witness, for plaintiff, Farrara, that the rope was in bad condition on the day prior to the accident, and that notice of that fact was given to Hollan, the foreman on the job. The defendants' contention is that the rope was comparatively new and in good condition; that its break was due to the alleged fact that the decedent had accidentally cut it, on the day before the accident; that when the scaffold was being hoisted into place the men who were hoisting indulged in skylarking to frighten the decedent's helper, a young "greenhorn" Italian, by hoisting the scaffold ends irregularly; and that in so doing they allowed the rope to chafe against an iron bracket at the top of the tower, and so to sever the strands of the rope. The plaintiff's witnesses denied the skylarking. The defendant produced two eyewitnesses, Schilling and Kane. Both of these witnesses testified that there was skylarking during the raising of the scaffold. There was evidence for the jury that the rope was in a bad condition, and that the foreman, Hollan, had notice of it, which he denied. Hollan was not present at the time of the accident.

There was a case for the jury under section 18 of the Labor Law, and I do not recommend any interference with the verdict.

[2] In the complaint it was alleged that the rope "was defective and was old and worn out." The appellants contend that, inasmuch as their proofs show that the rope was not "old," but comparatively new, the verdict and judgment are not secundum allegata. But I think the word "defective" covers the situation sufficiently.

[3, 4] Second. The next proposition to be examined is whether the Snare & Triest Company was shown to have been the decedent's employer.

The surface proof is that the defendant Steel & Masonry Contracting Company was the employer of the decedent. It paid him, and apparently directed him in work. The plaintiff, however, undertook to prove that the Steel & Masonry Company was but a paper corporation, organized and controlled by the Snare & Triest Company for the sole purpose of doing the laboring works on its jobs; it furnishing all materials, tools, and appliances to the Steel & Masonry Company and advancing all the moneys required by the pay rolls of the latter corporation. The Snare & Triest Company had a contract with the city of New York for the construction of this bridge. It claims to have subcontracted with the Steel & Masonry Company for the actual work of construction, so far only as to the doing of the labor was concerned. As before stated, it furnished all materials, all tools and appliances, and likewise all cash for pay rolls of the Steel & Masonry Company, and, in addition, it paid to the latter company every two months 5 per cent. of the net cost of the labor as shown by the pay rolls. The president and vice president of the Snare & Triest Company owned all the stock of the Steel & Masonry Company, except a few shares held by the officers of that corporation, apparently for the purpose of enabling them to hold their offices. There was a mass of evidence put in to show the modus operandi of both corporations, and their intimacy of business relations.

The court submitted to the jury the question whether the Steel & Masonry Company was really an independent subcontractor, or wheth-

er the Snare & Triest Company was the real principal, and the Steel & Masonry Company but a "dummy" agent, instrument, and working tool. The appellants claim this was error. It is argued that as the Steel & Masonry Company was a distinct corporate entity, differently officered, it was incompetent to go into the question of the circumstances of its organization, and its usual scope of business, which was concerned exclusively with the jobs of the Snare & Triest Company and its stock control.

The case at bar is in many ways like that of McCherry v. Snare & Triest Co., 130 App. Div. 241, 114 N. Y. Supp. 674, affirmed 198 N. Y. 532, 92 N. E. 1090, where a controversy was litigated at the trial whether the Snare & Triest Company was the real principal, acting through a dummy corporation known as the Metropolitan Bridge & Construction Company, under an arrangement between them practically the same as that shown in this record with reference to the Steel & Masonry Company. I sat as trial judge in that action and recall its controversy very clearly. It was held there, necessarily, that it was competent to show that a corporation, apparently an independent subcontractor, was in reality but a dummy device or tool used to enable another corporation, as the true and secret principal, to carry on its manipulations as to hiring and directing of labor employed really for the purposes of the secret principal. This question came up again in McKenna v. Snare & Triest Co., 147 App. Div. 855, 133 N. Y. Supp. 107. There the Metropolitan Bridge & Construction Company was involved, and the plaintiff recovered a judgment on the theory that the Snare & Triest Company was the true employer. That judgment was reversed on several grounds, viz., errors in the admission of evidence and errors in the charge of the trial court. There are several opinions; the prevailing one by Laughlin J., and a dissenting opinion by Miller, J. There is much consideration in both opinions on this very question now before us on this appeal.

The appellants rely upon the McKenna Case as deciding flatly that, where the Metropolitan Bridge & Construction Company formally hired and paid an employé for the doing of labor on a job which it was carrying on under a formal contract with the Snare & Triest Company, for the benefit of that company ultimately, it was improper to go behind the appearances, and to show that the Metropolitan Bridge & Construction Company was but a mere device and tool of the Snare & Triest Company; but that case, whatever was said, was not decided on that theory.

My opinion is that this question was properly submitted to the jury, and the plaintiff's evidence in regard to the actual conditions was competent.

[5, 6] Third. We come now to the most perplexing question in the case, viz.: Was the plaintiff the lawful wife of the decedent, and are her children his lawful issue?

The plaintiff and the decedent began to cohabit together in Italy. When this cohabitation began, the plaintiff had a living husband and the decedent a living wife, who continued to live with the decedent in the same house with the paramour. Thereafter the decedent and

the plaintiff came to America and cohabited together in all respects as if they were lawful husband and wife. Children were born and baptized with the father's name, the decedent generally referred to her as his wife, and she was known as such to the neighborhood. This cohabitation began illicitly; both parties were not free to contract a lawful marriage during the lifetimes of their lawful spouses. While this couple were living together for some years, the decedent's lawful wife died in Italy. This left him free to contract a marriage; but his concubine was not free, if her original husband was still presumably alive somewhere in South America, where he had gone many years before. Shortly after he went to South America, he wrote home once, sending a small sum of money, but then disappeared completely from the knowledge of his wife, and nothing was heard about him further for many years thereafter. Finally, as the plaintiff testified, she received a letter in 1910–1911 from her sister-in-law in Italy, informing her of the death of plaintiff's original husband by suicide, and that immediately thereafter the decedent and she, the impediments being removed, agreed together to be lawful husband and wife. If this couple, after the removal of the impediments, became by agreement lawful husband and wife, then their previously born children became legitimatized (chapter 531, Laws of 1895); if not, then said children are illegitimate.

There was much industry in the respective briefs by way of citation and quotation from the very numerous reported precedents, especially as to the rule of prima facie presumption that should apply. Yet the plaintiff's claim to be the lawful wife of the decedent does not rest alone upon prima facie presumptions, as she has given evidence as to a nonceremonial marriage after all mutual impediments were apparently removed. It is argued by the appellants that a merely verbal contract of marriage could not have been made lawfully in 1911. The respondent cites Matter of Hinman, 147 App. Div. 452, 131 N. Y. Supp. 861, and 206 N. Y. 653, 99 N. E. 1108, as holding to the contrary of appellants' contention. But the Court of Appeals did not pass upon that question, expressly excluding it from consideration. There is a statement in the opinion in 147 App. Div. 452, 131 N. Y. Supp. 861, to the effect advanced by the respondent; but it was not concurred in by the whole court, one justice concurring "in the result" and one dissenting. In the case at bar the jury found that the decedent and the plaintiff had become lawful husband and wife by verbal agreement prior to 1902. This finding was based partly on the statute as to presumption of death, and that which authorizes a person whose spouse has disappeared, and has not been heard from or about for the period of five years, to contract in good faith a new marriage, which, however, may be voidable.

[7] The learned counsel for the appellants feels that he had a rather hard time in this case. On the marriage question he was on a very unpopular side. The jury, or at least six of them, remonstrated with the court as to some language said to have been used by that counsel in his summing up, and declared that they had been "insulted" thereby. If this counsel had asked for a withdrawal of a juror and a

mistrial, his application should have been granted. But he did not so ask, and he took his chances. Now, this is an unusual case in its facts and the nature of the legal questions presented, but we see no imperative reasons calling for a reversal.

The judgment and order are affirmed, with costs. All concur.