THOMAS J. MANGAN, Plaintiff, *v.* TERMINAL TRANSPORTATION SYSTEM, INC., Defendant. (Action No. 1.)

C. EVARTS MANGAN, Plaintiff, *v.* TERMINAL TRANSPORTATION SYSTEM, INC., Defendant. (Action No. 2.)

RICHARD T. QUINNE, Plaintiff, *v.* TERMINAL TRANSPORTATION SYSTEM, INC., Defendant. (Action No. 3.)

SUSANNE O. RICE, Plaintiff, *v.* TERMINAL TRANSPORTATION SYSTEM, INC., Defendant. (Action No. 4.)

Supreme Court, Broome County, December 23, 1935.

*Mangan & Mangan*, for the plaintiffs.

*DeLancey Nicoll, Jr.* [*Moses Katcher* and *Martin W. Deyo* of counsel], for the defendant.

PERSONIUS, J. In Action No. 1 the plaintiff sues to recover damages to his automobile. The plaintiffs in the other actions were the driver and passengers in the automobile. They sue to recover damages for personal injuries. Such damages are alleged to have been caused by the negligence of the driver of a taxicab.

At the close of the evidence, each party moved for a direction of a verdict. The court asked the jury to assess the damages in the second, third and fourth actions. The jury assessed the damages of the plaintiff C. Everts Mangan at $175; of the plaintiff Richard T. Quinne at $150, and of the plaintiff Susanne O. Rice at $14,000.

It was stipulated that the court reserve decision on the motions for directed verdicts and, after considering the briefs of the parties, direct verdicts with the same force and effect as though directed in the presence of the jury.

The property damage of the plaintiff in action No. 1 is found to be $1,096.40.

We hold that each plaintiff was free from contributory negligence and that the accident and resulting damages were caused by the negligence of the driver of the taxicab involved. True, there was no contact. The accident occurred at the intersection of Forty-eighth street and Second avenue, New York city. The plaintiffs were proceeding on Forty-eighth street, a one-way street, with cars parked on either side. There was a lane for traffic on each side of the elevated pillar at the intersection. The plaintiffs' car was proceeding in the lane to the right of the pillar when the taxicab without warning turned suddenly and with some rapidity from the curb at the right. In an effort to miss it, and go to the left of the pillar, the driver of the plaintiffs' car hit the pillar.

The most mooted question is as to the liability of the defendant corporation. It claims to be a managing corporation only, not owning or operating any cabs, though they bear its name.

It appears that the Yellow Truck and Coach Manufacturing Company (a subsidiary of General Motors and herein referred to as the " holding company ") owned (1) all the stock of the General Motors Truck Corporation which manufactured the cabs, (2) all

the stock of General Motors Truck Company which sold them, (3) control of the stock of the Yellow Cab Manufacturing Acceptance Corporation (herein referred to as the "finance company"), which financed their sale, (4) all the stock of the defendant Terminal Transportation System, Inc., (5) sixty per cent of the stock of four so-called operating companies, viz., Island Cab Company, Triboro Cab Company, Inter-Manhattan Cab Company and Federal Cab Company. To illustrate:

Yellow Truck and Coach Manufacturing Company — holding company.

1. General Motors Truck Corporation — manufacturing company.
2. General Motors Truck Company — sales company.
3. Yellow Cab Manufacturing Acceptance Corporation — finance company.
4. Terminal Transportation System, Inc.— managing company.
5. Island Cab Company, Triboro Cab Company, Inter-Manhattan Cab Company and Federal Cab Company — operating companies.

The relationship between the defendant and the operating companies was rendered more intimate by contracts.

The cabs of the four operating companies were alike in design, appearance and color. With the consent, at least, of the defendant, each bore the name "Terminal" with a distinguishing emblem. They were referred to as and appeared to be the cabs of the Terminal system. True, each cab bore the name of the operating company, but in comparatively small letters, discernible only from a close view. The only other means of determining which operating company owned the cab was through the license plate. If, as in the present case, a plaintiff was unable to see or obtain the license number correctly, there was no means of identifying the cab except by the plainly visible word "Terminal" and the distinguishing emblem.

The defendant was organized about June 3, 1933. Prior thereto the Terminal Cab Corporation (terminated by receivership) owned and operated the cabs now owned by the four operating companies. It was financed by the same finance company and, apparently, owned or controlled by the same holding company. In addition to owning and operating the cabs, Terminal Cab Corporation held valuable concession contracts with a number of railroad, steamship and other terminals under which it furnished taxicabs therefor. These concession contracts were taken over by the defendant from the receiver, by assignment or otherwise. At about the same time (on March 30 and August 8, 1933) the four operating companies were formed and each took over approximately one-fourth of the cabs previously owned and operated by Terminal Cab Corporation.

These operating companies were financed by the same finance company. The same holding company held sixty per cent of their stock. The other forty per cent in each operating company was held by two men. They are directors of each operating company and constitute a majority of each board. Apparently the operating companies were organized by the same interests which organized the defendant. Mr. Seymour, the president of the defendant, was an officer of the Terminal Cab Corporation. Mr. O'Neil, one of the two individual stockholders and a director in each of the four operating companies, was president of the General Tire Company, from which the defendant purchased tires for the operating companies. Mr. Seymour testified: " That is why I got him as a stockholder." Thus Mr. Seymour, president of defendant, seems to have been actively interested in the organization of the operating companies.

As a result of this reorganization, the defendant became the owner of the concession contracts with the various terminals and *under obligation to furnish all those terminals with adequate cab service. That was its business.* The newly formed operating companies became the owners of the cabs. They immediately made contracts with the defendant whereby they engaged to operate the cabs for the defendant. *The defendant thereby provided a means for carrying out its contract to furnish cabs to the various terminals.*

Were not the operating companies mere agents and instrumentalities of the defendant in carrying out its business?

The defendant says the operating companies hired, disciplined and discharged their own drivers, received and banked their own cash and performed other acts which it says labels them as separate corporate entities.

Just how did these companies operate? We have pointed out that each was owned or controlled by the same holding company, that each had two of its three directors in common and that each operating company had the same contract with the defendant. The directors of all the contracting parties were chosen by the same holding company.

The defendant gave directions as to what terminals the respective operating companies should serve from day to day. The defendant provided inspectors and starters at each terminal and supervisors who at times at least were on the streets " controlling drivers, regulating them, seeing that they observed the rules of the City of New York and rules of the company." The defendant at its office in the General Motors Building kept the books of the operating companies. The daily receipts were reported to the defendant which did the accounting for the operating companies and drew the checks for their payroll at least. The defendant maintained a claim department for the operating companies and furnished legal

services. It sold the operating companies all parts, gasoline, oil, grease and tires. The defendant hired all mechanics and maintained a central repair garage. The defendant examined and investigated all persons applying for positions as drivers. If acceptable the applicant received a certificate which authorized the operating company to hire him. If a driver was hired without such certificate, he was required within a limited period to obtain it. While the defendant denies that it ever gave instructions to, hired or discharged a driver, it maintained a traffic department from which notices were sent to the operating companies relative to complaints, and directions to drivers. One read in part: " drivers who become disgruntled when getting a short call will do well to seek employment with some other company as in the future any complaint (in this respect) will be reason for instant dismissal." In other words, the operating companies did not hire a driver without the defendant's approval and, it may be fairly implied, disciplined or discharged a driver if the defendant said so. Suppose by contract the defendant expressly reserved the right to hire, discharge and control drivers, could it escape liability because the title to the *equity* in the cabs was in the operating company?

We think the corporate entity of the four so-called operating companies should be disregarded and the defendant held liable. When one corporation controls another, and uses it as the means, agency and instrumentality by which the former carries out and performs its business, it is liable for the torts of the latter. (*Industrial Research Corp.* v. *General Motors Corp.*, 29 F. [2d] 623, 625; *Steele* v. *Meaker Co., Inc.*, 131 Misc. 675, 677; affd., 226 App. Div. 717; *Chicago, M. & St. P. Ry.* v. *Minneapolis, etc., Assn.*, 247 U. S. 490, 501; *United States* v. *Reading Co.*, 253 id. 26, 62, 63; *Davis* v. *Alexander*, 269 id. 114, 117; Powell Parent and Subsidiary Corporations [herein referred to as Powell], 7, 8, 16, 35, 39 and 77.)

In *Steele* v. *Meaker Co., Inc.* (*supra*) the court said (p. 677): " The Auburn Delivery Company was organized to do the business of the C. G. Meaker Company and did work for no one else. It was the means employed by the C. G. Meaker Company to do a part of its work consisting of the delivery of its goods." In the present case the defendant and its allied interests organized the four operating companies " to do the business " of the defendant, viz, to furnish adequate cab service to the several terminals, which service the defendant was under contract to furnish.

In *Chicago, M. & St. P. Ry.* v. *Minneapolis, etc., Assn.* (*supra*) the court, recognizing the rule that " ownership, alone, of capital stock in one corporation by another, does not create an identity of corporate interest * * * or create the relation of principal and agent or representative between the two," said (p. 501): " While the

statements of the law thus relied upon are satisfactory in the connection in which they were used, they have been plainly and repeatedly held not applicable where stock ownership has been resorted to, not for the purpose of participating in the affairs of a corporation in the normal and usual manner, but for the purpose, as in this case, of controlling a subsidiary company so that it may be used as a mere agency or instrumentality of the owning company or companies." It has been questioned whether the New York rule was as broad as the Federal rule, but *Chicago, etc., Ry.* v. *Minneapolis, etc., Assn.* (*supra*) was cited with approval and substantially the above quoted language used in *Rapid T. Subway Constr. Co.* v. *City of New York* (259 N. Y. 472, 488) and *Davis* v. *Alexander* (*supra*) was cited in *Dobbins* v. *Pratt Chuck Co.* (242 N. Y. 106, 114).

In most cases where such liability has been imposed, control was exercised through stock ownership. However, control by this means is not essential. " Sometimes the parent's dominance is achieved by written *contract* which takes away the subsidiary's normal power of running its affairs." (Italics ours.) (Powell, 36, § 8 and cases cited; *United States* v. *Delaware, etc., R. R.*, 238 U. S. 516, 529; *Costan* v. *Manila Electric Co.*, 24 F. [2d] 383.) In the former case the court said (p. 529): " But the decisions construing the statute, recognize that one corporation can be an agent for another corporation and that by means of stock ownership one of such companies may be converted into a mere agent or instrumentality of the other. * * * And, this use of one by the other — or this power of one over the other — does not depend upon control by virtue of the fact that stock therein is held by the Railroad Company or by its shareholders. For dominance of the Coal Company may be secured by a carrier * * * not only by an express contract of agency, but *by any contract which in its practical operation gives to the Railroad Company a control.*" (Italics ours.) Likewise the control essential to render one corporation the agent or instrumentality of the other may be effected " by ownership in the hands of persons who by like means control the dominant corporation." (Powell, 37, § 10, and cases cited; *Matter of Muncie Pulp Co.*, 139 Fed. 546.)

In the present case, control over the four operating companies is exercised both by the contracts between them and the defendant, and by the holding company's ownership of all the stock of the defendant and a controlling interest in the stock of the operating companies. The directors of both parties to each of these contracts are elected by the same holding company.

The defendant relies largely on *Berkey* v. *Third Avenue Railway Co.* (244 N. Y. 84). The court there held that the defendant was

not liable for an accident on the lines of the Forty-second Street, etc., Railway Company. The franchise to operate said lines belonged to the Forty-second Street Company. It was not organized by the defendant. They had inter-company dealings and the defendant owned substantially all of the stock of the Forty-second Street Company. Their boards of directors and executive officers were nearly the same. Pointing out (p. 90) that " 'no franchise nor any right to or under any franchise, to own or operate a railroad or street railroad shall be assigned, transferred or leased, nor shall any contract or agreement with reference to or affecting any such franchise or right be valid or of any force or effect whatsoever,' " unless approved by the Public Service Commission, the court · said (p. 90): " The plaintiff's theory of the action requires us to assume the existence of a contract between the defendant on the one side and the Forty-second Street Company on the other." Again (p. 91): " we cannot bring ourselves to believe that an agreement, criminal in conception and effect, may be inferred from conduct or circumstances so indefinite and equivocal." The court in the *Berkey* case based its decision upon the ground that to hold the defendant liable, it must *imply* an illegal contract and find that the defendant was illegally operating the car and lines involved. Not so here. The defendant's charter, among other things, gives it the right " to carry on a general taxicab business." The defendant argues that it would have been illegal for it to have operated the cabs bearing its name and emblem because it did not license them or carry the liability insurance required. It might have been guilty of a misdemeanor but this would have resulted, not from the fact that it operated illegally, but from the fact that it did not comply with the requirements of operation. In the *Berkey* case the court said (p. 92): " We do not mean that a corporation which has sent its cars with its own men over the route of another corporation may take advantage of the fact that its conduct in so doing is illegal to escape liability for the misconduct of its servant. * * * A defendant in such circumstances is liable for the tort, however illegitimate the business, just as much as it would be if its board of directors were to order a motorman to run a traveler down. We do mean, however, that an intention to operate a route in violation of a penal statute is not to be *inferred*." (Italics ours.)

Furthermore, the *Berkey* case recognizes the rule of the Federal cases. At page 94 the court said: " This being so, there is no need to choose between the Federal doctrine and our own, if indeed when they are understood, there is any difference between them." Again (p. 95): " Dominion may be so complete, interference so obtrusive, that by the general rules of agency the parent will be

a principal and the subsidiary an agent. Where control is less than this, we are remitted to the tests of honesty and justice * * *. The logical consistency of a juridical conception will indeed be sacrificed at times when the sacrifice is essential to the end that some accepted public policy may be defended or upheld. This is so, for illustration, though agency in any proper sense is lacking, where the attempted separation between parent and subsidiary will work a fraud upon the law." (Citing *Chicago, M. & St. P. Ry. Co.* v. *Minneapolis, etc., Assn., supra,* and *United States* **v.** *Reading Co., supra.*)

In *Jenkins* v. *Moyse* (254 N. Y. 319) and *Fraw Realty Co.* v. *Natanson* (261 id. 396), cited by defendant, the subsidiary corporation itself attempted to escape corporate liability. In the latter case (at p. 406) the court said: " Those who created a corporation seek, not to insist upon the reality of the corporate form, but to have it ignored, so that the character of a ' dummy ' or subsidiary for another corporation may be fastened upon it, to the end that the corporators may correspondingly profit." This, properly, the court refused to permit. In *Pagel, Horton & Co., Inc.,* v. *Harmon Paper Co.* (236 App. Div. 47), cited by defendant, at pages 48 to 49 the rule is recognized that the courts will look beyond corporate entity " where one [corporation] is so organized, related to or controlled by the other as to be its mere agent, instrumentality or *alter ego.*" It is undoubtedly true, as held in that case, that power of control resulting from *mere* stock ownership or common directors and officers, is insufficient to fix liability upon the parent company.

The plaintiffs here did not and could not obtain or furnish the name of the so-called operating company owning the cab involved or its license number. They did, however, obtain and testify that the cab bore (1) the word " Terminal; " (2) the insignia of all of the cabs owned by the four operating companies, and (3) the color and trimming which was common to all these cabs. This, uncontradicted, was sufficient to show that the cab involved was owned and operated by one of the four so-called operating companies. (*Callas* v. *Independent Taxi Owners' Assn.,* 66 F. [2d] 192, 194; *Gershel* v. *White's Express Co.,* 113 N. Y. Supp. 919; *Baldwin* **v.** *Abraham,* 57 App. Div. 67, 69.)

We hold that the four operating companies were the agents and instrumentalities through which the defendant carried on its business, that their operation was controlled by the defendant and that it is liable for the negligence of the driver of the cab involved.

A direction of verdict may be entered in favor of the plaintiff Thomas J. Mangan for $1,096.40, in favor of the plaintiff C. Everts Mangan for $175, in favor of the plaintiff Richard T. Quinne **for** $150, and in favor of the plaintiff Susanne O. Rice for $14,000.