Saul S. Street, J.
This is an application for a preference at a pre-trial hearing.
Pretrial procedure was adopted by the Justices of the Appellate Division for the First Department on January 5, 1948. Since that time there has been a daily pre-trial calendar call and preliminary hearing of personal injury jury cases for the purpose of simplifying the issues and attempting to dispose of actions by settlement. This represents one of the outstanding procedural developments in this country. It has been of material aid in reducing calendar congestion. From the date of its inception over 25% of all personal injury jury cases have been disposed of at pretrial hearings each year.
Under the rules, attorneys with authority to act are under a duty to appear at these hearings with a sincere intent to co-operate with the court in achieving settlements. An excessive demand by a plaintiff is regarded as tantamount to a failure to co-operate and results in a remand of the case to its original position on the calendar. Refusal by a defendant to disclose the amount of insurance or reinsurance carried or the concealment of any facts concerning the financial standing of the defendant or, where there is a prima facie case and the injuries are severe (though there may be a disputed issue of liability), the offer of a mere nominal sum are deemed failures on the part of the defendant to co-operate and negotiate in good faith to reduce the negligence case load. Such conduct is held to warrant the granting of a preference or the taking of such other action as may be appropriate.
The bill of particulars in the case before me alleges that this plaintiff, a 39-year-old housewife, while crossing 42d Street near Eighth Avenue, was struck and knocked down by the defendant’s taxicab, whose driver was proceeding at a fast and unreasonable rate of speed. Plaintiff claims that her injuries consisted of:
(a) cerebral concussion;
(b) a perpendicular fracture of the pubic bone;
(c) comminuted fractures of the junction of the right pubic bone;
(d) oblique fractures to the body of the right pubic bone;
(e) increased bone density at the site of the left-sided fractures;
(f) permanent deformity on the right side with decrease in size, and change in shape of the right obdurator foramen;
*498 (g) separation of the symphsis pelvis, and a permanent deformity on the right side of the pelvic structure;
(h) pain and suffering which still exists and which will continue for the rest of her life.
Plaintiff alleged that she has expended about $1,400 for hospital and medical expenses.
The defendant has admitted that the plaintiff was knocked down by its taxi, but it denies liability on the ground that defendant was not negligent and that plaintiff was contributorily negligent. The questions of negligence and contributory negligence are, of course, questions of fact which must ultimately be determined by a jury, if the case cannot be settled. There is no dispute, however, that plaintiff has sustained the injuries complained of or that she has expended the amount referred to for hospital and medical bills. At the pretrial hearings before me the defendant’s representative at first offered $2,500, and later $3,500, in settlement. This offer falls far short of being fair and adequate for the injuries in this case, after giving due consideration to the fact that the issues of negligence and contributory negligence are for the jury to determine at a trial. If the defendant were not in the public business of carrying passengers for hire as a common carrier and if defendant’s resources were so limited that the offer of only $3,500 for plaintiff’s injuries could be considered to represent a bona fide attempt to settle the case, there would be no need for further discussion.
However, a cursory examination of the machinations and operations of the owners of the defendant corporation reveals that'they are the beneficiaries of a most valuable franchise from the city and that their true assets have been concealed from the public.
The hearing before me disclosed that the principal stockholders of the defendant corporation are a man named Ackerman and some members of his family; that the Ackermans actually have 300 taxicabs, which have been licensed by the City of New York to operate on the city streets; that they have formed 150 corporations, each of which has record title to two taxicabs; that these 300 taxicabs are housed, maintained, and serviced in garages owned by the Ackermans; that the Ackermans and a man named Rosenblatt (who has 200 cabs registered in the name of 100 corporations) own the Mutual Adjustment Company, a licensed private detective agency. This company employs six men and three girls who devote themselves exclusively to the adjustment of claims against the Ackerman and Rosenblatt cabs. The inference is clear that the same *499 employees are used to adjust claims against all 300 Ackerman cabs and that the same mechanics, maintenance men, dispatchers, gas fillers, and bookkeepers are used for all of the cabs. The officers of the 150 corporations are identical. A Mr. Treves and a Mr. Feder, employed by the Mutual Adjustment Company, explained to me that they could not offer more than $3,500 in this case because the statutory bond filed by defendant corporation is limited to $5,000 for injury to one person and the only assets of the corporation are two taxicabs worth $2,300 each. The Ackermans do not carry any insurance for any of their taxicabs, but in pursuance of a provision of the Vehicle and Traffic Law, they do file a bond for each cab guaranteeing payment of any judgment up to $5,000 for injury to one person and $10,000 for injuries to more than one person. By filing a bond, the Ackermans avoid paying the premium for insurance in the amount which would otherwise be required. Where a bond is filed, the Ackermans must pay for the personal injuries themselves up to the limits of the bond. The inference is clear that the Ackermans have formed these 150 corporations to limit their liability for any accident to the amount of the bond, and the two taxicabs held by the corporation whose taxi caused the injury, and to prevent resort, in the case of a substantial injury, to any of the cabs registered in the names of their other 149 corporations.
Although a person owning the capital stock of a corporation is ordinarily not liable for the debts and liabilities of the corporation, nor does he by such ownership create the relationship of principal and agent, this principle is not applicable where “ stock ownership has been resorted to, not for the purpose of participating in the affairs of a corporation in the normal and usual manner, but for the purpose * * * of controlling a subsidiary company so that it may be used as a mere agency or instrumentality of the owning company or companies ” (Chicago Milwaukee & St. Paul Ry. Co. v. Minneapolis Civic & Commerce Assn., 247 U. S. 490, 501), or where dominion is so complete, interference so obtrusive that by general rules of agency the parent will be a principal and the subsidiary an agent (Berkey v. Third Ave. Ry. Co., 244 N. Y. 84, 94, 95; see, also, Mangan v. Terminal Transp. System, 157 Misc. 627, affd. 247 App. Div. 853). In the instant case the Ackermans were the organizers of the corporations long after they obtained their franchises. Although the question of whether their domination or use of the corporations was such as to make the corporations their agents and render the Ackermans personally liable for the corporate obligations may *500 not properly be determined at this time, enough evidence in that direction exists for its ultimate submission to this court. In the light of plaintiff’s substantial injuries, her prima facie case, the concealment of assets from the public by the Ackermans and the possibility that plaintiff may succeed in piercing the corporate entity, the defendants’ offer of $3,500 does not represent a bona fide attempt to settle this case. Hence a preference is warranted.
In view of the great number of taxicab injury cases clogging the calendar of this court, and the extent to which owners of taxicab fleets have adopted the Ackermans’ device of forming many corporations and registering only a few taxicabs (generally only two) in the name of each, with the result that numerous persons injured in taxicab accidents are left with grossly inadequate redress for their injuries, the court deems this an appropriate occasion to point out the crying need for legislative relief, both in the State Legislature and locally.
The situation presented in the present action is not an isolated one. On the contrary, it is a common one — in fact, the common one. A survey discloses that 11.3% of all the personal injury actions brought in the New York County Supreme Court are against taxicab owners for the negligence of their chauffeurs. The Police Department reports indicate that in 1955 taxicabs were involved in 3,685 accidents concerning personal injuries and 2,821 accidents concerning property damag’e. In 1956 the figures were 3,235 and 2,441, respectively; in 1957, 3,489 and 2,771. In 1937, 8,424 taxicabs were owned by 380 corporate fleet ownerc Today, although the number of fleet-owned taxicabs has been reduced to 6,816, the number of corporations owning this smaller number of taxicabs has been increased from 380 to 2,120. Of these 2,120 corporations, only 332 own three or more taxicabs. Although the increase in the number of corporations and the reduction of the number of taxicabs registered in the name of each may, in some instances, have been partially motivated by the legitimate desire to reduce Federal income taxes (the corporate Federal income tax provides for a tax of 30% on income up to $25,000 per year, whereas the tax is 52% on income over that amount), it is clear that the predominant motive, generally, has been the desire to avoid recovery of more than nominal or negligible amounts on judgments obtained for negligent operation of the taxicabs.
On March 9, 1937, the legislative body of the City of New York enacted chapter 27-a of the Code of Ordinances of the City of New York, which is now section 436-2.0 of the Admin *501 istrative Code of the City of New York. In this enactment it was declared and found that the taxicab industry in the city of New York is “ vested with a public interest ”, and “ financial irresponsible operation whereby the ownership of taxicabs has been transferred in order to avoid tort obligations ” was condemned. The number of licensed taxicabs was frozen to the number then existing, viz.: 13,566, consisting of 5,142 individually owned taxicabs and 8,424 fleet-owned (i.e., owned by the same person or corporation). It was also provided that the ratio of individually owned cabs to fleet-owned cabs was to be maintained. In the event that additional licenses are issued, those available for owners of more than one taxicab are to be allocated (Administrative Code, § 436-2.0, subd. 11, par. [a]) to the then existing fleet licensees “ in the ratio of the number of licenses held by the licensee, to the total number of licenses which is held by owners of more than one taxicab ”.
One result of this legislation was to confer a monopoly as to taxicab operation upon the then owners of taxicabs and those who acquire their licenses. In 1952 the city permitted a 25% increase in taxi fares. By freezing the number of taxicab licenses permitted to be issued, and increasing the fares the value of each taxicab license (popularly referred to as the “ medallion ”) has today reached the market value of approximately $17,000. Ironically enough, the practice of splitting up the registered ownership of fleet-owned taxicabs into many splinter corporations began, as the court is informed by the police department, just about the time that the fares were increased. Some idea of the value of this monopoly and of the extent of the public interest involved may be gained from information revealed by a cursory examination of the records of a reputable owner of a large fleet. Each of its cabs is on the city streets approximately 20 hours per day, seven days per week; it travels approximately 60,000 miles per year and brings in an average of $45 per day, carrying 100 passengers per day. It receives, on the average, one claim per cab per year for personal injuries. When we consider that there are almost 12,000 taxicabs roaming the streets of the city today, simple mathematics will disclose that we are dealing with a major industry and public utility. The gross income from this taxi business is approximately $150,000,000 per year. The number of passengers carried annually is well over 300,000,000. The figure is fairly comparable to the number of passengers carried by the surface transportation furnished by the City of New York (buses) to wit, a little over 400,000,000 per year. Here the city has invested untold millions and assumes complete *502 responsibility for the negligence of its drivers. It is also apparent from these figures that about 12,000 persons in New York City file claims for personal injuries each year. This is over 30 personal injury claims per day.
Notwithstanding the valuable monopoly enjoyed by the taxicab owners, they are required to provide protection for injuries to the public (by bond or insurance) only in the amount of $5,000 for injuries to one person and $10,000 for injuries to two or more persons (Vehicle and Traffic Law, § 17). Although the State Legislature, in 1952, increased the amounts required to be carried as to vehicles having a seating capacity of eight or more passengers above the amounts theretofore required, the limits for vehicles seating up to seven passengers (primarily taxicabs) were left at $5,000 and $10,000. This despite the increased cost of living since these limits were fixed in 1932 and the increase in the average verdicts throughout the State. We thus have the anomalous situation where there is no limit to the liability of the city for accidents caused by the negligence of its transportation employees and where the owners of private cars must carry insurance of $30,000 for injury to one person and $20,000 for injuries to two or more persons, while the owners of taxicabs, who are the beneficiaries of the valuable monopoly conferred upon them by the 1937 local statute, and whose taxicabs are responsible for a very large number of injuries to the public, are required to protect the public only to the extent of $5,000 for injury to one person and $10,000 for injuries to two or more persons.
To make matters worse, although taxicab licenses may be transferred by voluntary sale or transfer, with the approval of the hack bureau, provided that “ the applicant assumes, agrees to pay, and satisfies the commissioner of his ability to discharge, all the outstanding tort liabilities of the vendor, or transferor * * * which is in excess of the amount which is covered by any bond or policy of insurance as required by the vehicle and traffic law of the state of New York ” (Administrative Code, § 436-2.0, subd. 7), there is no provision permitting a person holding a judgment, based on the negligence of a taxicab driver, to reach the valuable license (worth about $17,000) issued for the taxicab involved in the accident. In the case of an involuntary transfer of a license, a “ temporary, non-transferable license ” may be issued “ for a period not exceeding one year ” and not renewable (Administrative Code, § 436-2.0, subd. 9). Why a person injured by the negligence of a taxicab driver, whose claim has been reduced to judgment, may not have the valuable license sold to a purchaser approved *503 by the authorities under the same conditions as apply when a licensee voluntarily transfers his license is a question difficult to answer.
In the court’s opinion, the situation here disclosed imperatively demands the enactment of legislation to remedy it. The local Legislature should enact legislation eliminating the existing distinction between voluntary and involuntary transfers of licenses, so that the valuable license may be reached by persons injured through the negligence of the taxicab driver. The amounts of the bond or insurance required by the State Legislature should be substantially increased. The Superintendent of Insurance informs me that the premium for taxicab insurance (of $5,000 and $10,000) in the city of New York (except the Borough of Richmond) is $34 per month for an individual owner, $80 per month for an individual owner and another driver, and $110 per month for each fleet-owned taxicab; and that the increased cost of a policy with $10,000 and $20,000 limits would be only 30%, and for a policy with limits of $20,000 and $40,000 only 50%. These are small amounts, indeed, in the light of the valuable monopoly enjoyed and the large revenues obtained. It is interesting to note that the taxi industry carried more passengers in 1956 and 1957 than did the Fifth Avenue Coach Company, yet the Fifth Avenue Coach Company in 1956 paid a franchise tax to the city of $909,499, a State franchise tax of $27,324, a gross earnings tax of $165,729, and a public utilities tax of $303,980. The only fee required for the monopoly of which the taxi owners are the beneficiaries is an annual fee of $60 per year.
In concluding, attention should be called to the fact that the 1937 enactment, above referred to, contained a legislative finding of ‘1 financial irresponsible operation whereby the ownership of taxicabs has been transferred in order to avoid tort obligations ”, yet omitted any adequate remedy to those injured who attempt to reach the valuable license or ‘ medallion ’ ’, and omitted any provision which would prevent the prevalent practice of dividing up fleet operation into many splinter corporations, each owning only a few taxicabs. Legislation to combat this practice is urgently needed.
My conclusion is (1) that the public is inadequately protected with respect to compensation for personal injuries sustained through the negligence of taxicabs; (2) that the true owners of most of the large fleets of taxicabs are using a corporate device to defraud the public; and (3) the State and the city are unwitting accomplices of a legalized racket to avoid liability for payment for the negligent maiming and killing by taxicabs.
*504 I recommend (1) that section 17 of the Vehicle and Traffic Law be amended so as to provide that all taxicabs be insured or bonded for not less than $20,000 for one person and not less than $40,000 for more than one person; (2) that the New York City Administrative Code be amended to permit a judgment creditor to levy on the (medallion) license of taxicab owners; and (3) that the Legislature conduct a full investigation of this apparent taxicab fleet racket.
The application for a preference is granted and the case is placed on the calendar of Trial Term, Part II, for March 28, 1958.