IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 14, 2012 Session

## ROBERT THOMAS EDMUNDS v. DELTA PARTNERS, L.L.C., ET AL.

**Direct Appeal from the Circuit Court for Robertson County**
**No. 74CCI-2009-CV24      Ross H. Hicks, Judge**

_____

**No. M2012-00047-COA-R3-CV - Filed December 18, 2012**

_____

Appellant corporation appeals the trial court's rulings finding it liable for breach of contract damages, prejudgment interest, and damages pursuant to the Fair Labor Standards Act. Additionally, the corporation's president appeals the trial court's action in piercing the corporate veil to hold him personally liable for the contract damages. We reverse the trial court's finding with regard to veil piercing, but affirm the trial court in all other respects.

**Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Circuit Court Affirmed in Part; Reversed in Part; and Remanded**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which DAVID R. FARMER, J., joined, and Holly M. Kirby, J., filed a concurring opinion.

John B. Holt, Springfield, Tennessee, for the appellants, Delta Partners, L.L.C. and Michael Richard Garrison.

Richard L. Colbert and Courtney L. Wilbert, Franklin, Tennessee, for the appellee, Robert Thomas Edmunds.

**OPINION**

**I. Background**

Plaintiff/Appellee Robert Edmunds was offered employment by Defendant/Appellant Delta Partners, L.L.C. ("Delta") in 2004. Delta's purpose was to perform "turnarounds" for manufacturing companies, helping the companies to cut costs and increase profitability. Upon accepting the offer of employment, Mr. Edmunds received several documents regarding his employment with Delta, including a non-disclosure agreement, and a non-compete covenant, to which he agreed. The documents further provided that:

> In consideration of the performance of all services required by Delta [], the confidentiality provisions and covenant not-to-compete set forth herein, the Company [i.e. Delta] agrees to pay Employee [i.e. Mr. Edmunds] a salary outlined in the Employee Offer Letter. This initial salary and other benefits provided to Employee pursuant to the Offer Letter may, from time to time as agreed by Employee and Company, be modified.

The document further provided that "[e]mployment shall be terminable for cause, such cause being in the sole discretion of Delta . . . ." Both Mr. Edmunds and Defendant/Appellant Michael Garrison, as President and CEO of Delta, signed the document. Mr. Edmunds' Employee Offer Letter stated that his starting salary would be $65,000.00. The document also stated that Delta was an at-will employer. From 2004 until sometime in 2006, Mr. Edmunds was paid his salary in biweekly installments of $2,500.00, totaling $65,000.00 per year.

Subsequent to Mr. Edmunds accepting the offer of employment with Delta, Mr. Garrison came to own 95% of Delta stock, with his wife owning the other 5%. In 2006, Delta experienced financial difficulties, and could no longer afford to pay employees. However, Mr. Edmunds stayed with the company "out of personal loyalty" to Mr. Garrison. In 2006, 2007 and 2008, Mr. Edmunds received sporadic payments from Delta. Ultimately, Mr. Edmunds left the company in October 2008 due to the lack of payments, and sought payment of the funds owed to him under the alleged employment contract for the prior three years.

When Delta refused to pay, on January 22, 2009, Mr. Edmunds filed this lawsuit in the Robertson County Circuit Court. A bench trial was held on September 19, 2011. Mr. Edmunds testified that, from 2004 until 2006, he was paid according to the terms of the Offer of Employment. According to Mr. Edmunds, from the time he was hired in 2004 until he left Delta in 2008, he reported to work five days a week for a total of forty (40) hours per week. Mr. Edmunds testified that, while at work, he performed clerical tasks, worked on computer issues and software programming, and took telephone calls from clients and other employees. Per Mr. Edmunds' testimony, these phone calls occurred throughout his time with Delta and involved clients and employees in Tennessee, as well as Alabama, Kentucky, Indiana, and other states. In addition, in order for the employees to be paid each month, Mr. Edmunds would use a computer program to input the data regarding their time and wages each month; the computer program would then create checks to be signed by Mr. Garrison and distributed to the employees. However, in 2006, Mr. Garrison informed Mr. Edmunds that the company was experiencing financial difficulties and work had "slowed dramatically." Mr. Edmunds

chose to remain with the company despite these difficulties and, according to his testimony, performed the same clerical and administrative tasks as before, including inputting the payroll information and answering phone calls from clients and employees in other states. Delta was unable to pay Mr. Edmunds his full salary in 2006, 2007, and 2008. From the evidence presented at trial, Mr. Edmunds was paid a total of $3,800.00 in 2006, $21,250.00 in 2007 and $42,500.00 in 2008. For much of 2008, Mr. Edmunds was receiving his usual $2,500.00 biweekly payment. However, due to more difficulties, these payments again stopped in the summer of 2008. When asked whether Mr. Garrison ever explained Delta's failure to pay Mr. Edmunds his prior salary, Mr. Edmunds admitted that Mr. Garrison may have later informed him that the company did not have enough funds to cover payroll. Mr. Edmunds testified, however, that at no time did Mr. Garrison terminate Mr. Edmunds' employment or inform Mr. Edmunds that he would only be paid contingent on Delta getting more work, nor did he suggest that Mr. Edmunds seek unemployment in early 2006. Instead, Mr. Edmunds testified that Mr. Garrison "told me he'd pay me when he could. He told me that he was going to pay me every penny he owed me, to trust him." In addition, Mr. Edmunds testified that he and Mr. Garrison had even discussed the tax consequences of Mr. Edmunds receiving a considerable amount of back pay in a lump some, stating that sometime in 2007, after reassuring Mr. Edmunds that he would be paid the full amount he was allegedly owed, Mr. Garrison asked, "[D]o you want all of it at once or part of it? You have got to think about the taxes situation." However, Mr. Edmunds never received any back pay for the amounts he was allegedly owed and, when payments again stopped in 2008, Mr. Edmunds left his employment with Delta and sought unemployment benefits, which Delta did not oppose.

Mr. Edmund's wife, Amy Edmunds, also testified that Mr. Garrison reassured both herself and her husband that Mr. Edmunds would be paid in full for his employment with Delta in 2006, 2007, and 2008. According to Mrs. Edmunds, she and her husband went into considerable debt as a result of Mr. Edmunds not being paid, despite her income as a teacher. The couple first used approximately $7,000.00 or $8,000.00 they had earmarked to be put into a 401K. Once that money was exhausted, the couple turned to a home equity loan. According to Mrs. Edmunds, the couple drew approximately $33,000.00 from the home equity line in 2006, at an interest rate of eight to nine percent, $25,000.00 in 2007, at an interest rate of seven to eight percent, $4,000.00 in 2008, at an interest rate of four to seven percent, and $14,000.00 in 2009, at an interest rate of 2.75 percent. According to Mr. Edmunds, all of the money drawn from the home equity line was used to pay basic living expenses. In addition, both their retirements were delayed due to Mr. Edmunds not receiving his full pay from 2006 to 2008.

Through Mrs. Edmunds' testimony several letters and emails were introduced in which Mrs. Edmunds requested that Mr. Garrison and Delta pay the money that was allegedly

owed to Mr. Edmunds. The letters, which date as early as May 24, 2007, expressed frustration with Mr. Garrison's continued failure to pay Mr. Edmunds, as well as Mr. Garrison's assurances that "something should be happening soon." One letter, however, stated that Mr. Edmunds would not look for another job because he believed that he would be unable to secure employment due to his age[1] and that Mr. Edmunds became angry and refused to discuss Delta's problems and outlook with Mrs. Edmunds. Included in the emails were also responses to Mrs. Edmunds' emails from Mr. Garrison. In one of the emails, dated September 7, 2007, Mr. Garrison assured Mrs. Edmunds that work would pick up and that "things should get back on a regular basis quickly and then begin catching up some of the back pay." In another response, dated August 21, 2008, Mr. Garrison assured Mrs. Edmunds that he had taken no salary or profit from the company, instead all income to the company had gone to pay operating expenses, payroll and taxes on the company's two field employees. Mr. Garrison also assured Mrs. Edmunds that Delta was "almost 100%" sure to get another client in the coming weeks. However, due to the current lack of money, Mr. Garrison offered "[one] alternative"—to "lay [Mr. Edmunds] off and he can draw unemployment until there is income to pay him with or he finds another job." Mr. Garrison stated that he had spoken with Mr. Edmunds earlier in the week and offered to let him go back home and that he:

> never insisted or even asked him to work without getting paid and never will. I have the deepest possible gratitude for him staying the course and do not go through [one] single day without thinking about the debt and debt of gratitude I have for him. . . .

> *   *   *

> I fully intend to make everything right whenever I can. If [Mr. Edmunds] has to leave and find another job, I will do all I can to help him in any way I can and will not discourage him in any way. I never have. I have every intention of meeting my obligation to [Mr. Edmunds] whenever I can regardless.

Thus Mrs. Edmunds testified that she and her husband were always led to believe that Mr. Garrison would pay Mr. Edmunds back for his lost wages from 2006 to 2008.

Mr. Garrison denied that Mr. Edmunds was employed pursuant to a contract. Instead, he stated that the document signed by himself and Mr. Edmunds was an employee application and that Mr. Edmunds was merely an at-will employee. According to Mr. Garrison, in 2006,

---

[1] Mr. Edmunds' age is not specifically stated in the record. He and his wife have two adult children.

he informed all the employees, including Mr. Edmunds, that Delta could not make payroll. Mr. Garrison testified that, at that time, he encouraged Mr. Edmunds to seek new employment or his unemployment benefits. Because of Mr. Garrison's and Mr. Edmunds' long-standing friendship, however, Mr. Edmunds chose to stay on with the company. Mr. Garrison testified that he never specifically stated that Mr. Edmunds' employment was terminated, nor did he ever tell Mr. Edmunds to stop coming into work. However, he did encourage Mr. Edmunds to seek unemployment compensation and to "do what was best for him and his family." Mr. Garrison also testified that they never entered into an agreement wherein Mr. Edmunds would work for free. Instead, Mr. Garrison testified that he made it clear to Mr. Edmunds that Mr. Edmunds was to be paid only when Delta had projects, and, therefore, money, to pay him with. Despite this "understanding," Mr. Garrison testified that Mr. Edmunds continued to report to work as usual until he resigned in the fall of 2008. According to Mr. Garrison, Mr. Edmunds was paid for all biweekly periods in which Mr. Edmunds did work for Delta on projects. On weeks he was not paid, he merely came into the office to answer the occasional phone call, but, because there were no ongoing projects, work was scarce. According to Mr. Garrison, because there was no contract of employment, Delta owed Mr. Edmunds no back pay for the weeks he had worked and not been paid. However, Mr. Garrison admitted that, in an email he wrote to Mrs. Edmunds, which is included in the record, he stated he could not pay Mr. Edmunds, despite the fact that he had funds to pay salaries and payroll taxes on other employees. Additionally, in the email, Mr. Garrison admitted that he was extremely busy with work for the company, working every night until midnight for seventeen weeks, as well as ten to eleven hours running a client's manufacturing plant all day. However, when asked about the "debt" portion of his statement in an email saying that he owed Mr. Edmunds a "debt and a debt of gratitude," Mr. Garrison stated that he was referring to "part money." When asked about his prior statement that he would catch up on "back pay," Mr. Garrison responded that he was not referring to "a total sum," but was merely stating that he would provide Mr. Edmunds with as much as he "possibly could."

Mr. Garrison also denied that Mr. Edmunds did any work relating to any projects other than those in Alabama from 2006 until 2008. According to Mr. Garrison, while Delta attempted to gain clients out of state, their efforts were fruitless. For example, Mr. Garrison stated that, sometime in 2007 or 2008, Delta attempted to "sell a package" to a client in Alabama, but that the company chose not to buy the package. Mr. Garrison also admitted that one Delta employee worked at a company in Alabama. According to Mr. Garrison, in order to gain clients, Delta would either visit or "call a number of times," but that they "[n]ever did a penny of business" with most of the clients they solicited. In addition, Mr. Garrison stated that Delta had full-time or contract employees who lived and worked outside of Georgia and Alabama. Mr. Garrison admitted that, in addition to answering any phone calls to the Delta office, Mr. Edmunds input the data regarding these out-of-state employees' time sheets in order to generate checks for the employees.

Mr. Garrison further testified that, although Delta was still officially registered as an L.L.C. with the Secretary of State, it was not operating because there was no more work. However, Mr. Garrison continued to file required annual reports for the corporation until the time of trial. In addition, Mr. Garrison testified that, from 2006 on, "Delta [] was essentially [him]," and that it operated out of his home.

The trial court entered a Memorandum Opinion and Order on November 10, 2011. In the order, the trial court ruled that Mr. Garrison was Delta's alter ego and that both were liable to Mr. Edmunds for breach of the employment contract, and unpaid minimum wages and attorney fees under the Fair Labor Standards Act, 29 U.S.C. § 201 *et. seq.* The trial court awarded Mr. Edmunds damages for breach of contract in the amount of $116,034.52 together with prejudgment interest at a rate of 7% per annum, and $10,660.00 in unpaid minimum wages, as a set off to the breach of contract damages, together with $10,000 in attorney fees for work on the federal claim. Delta and Mr. Garrison appeal.

## II. Issues Presented

1. Whether the trial court erred in finding a valid and enforceable contract for employment after January 2006?
2. Whether the trial court erred in the decision to award pre-judgment interest at a rate of seven percent (7%) interest?
3. Whether the trial court erred in the decision to consider Mr. Garrison the alter-ego of Delta, and therefore to find him personally responsible for the judgment?
4. Whether the trial court erred in the decision to find that Mr. Edmunds was engaged in commerce under the Fair Labor Standards Act as defined in 29 U.S.C. §203, thereby allowing a judgment and attorney fees?

## III. Standard of Review

This action was tried by the trial court without a jury. As such, we review the trial court's findings of fact *de novo* with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). No presumption of correctness, however, attaches to the trial court's conclusions of law and our review is *de novo*. *Blair v. Brownson*, 197 S.W.3d 681, 684 (Tenn. 2006) (citing *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000)).

For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *4215 Harding Road Homeowners Ass'n. v. Harris*, 354 S.W.3d 296, 305 (Tenn. Ct. App. 2011); *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000). Where the trial court does not make

findings of fact, there is no presumption of correctness and we "must conduct our own independent review of the record to determine where the preponderance of the evidence lies." **Brooks v. Brooks**, 992 S.W.2d 403, 405 (Tenn. 1999).

## IV. Analysis
## A. Breach of Contract

Delta first argues that the trial court erred in finding that Mr. Edmunds was employed by Delta pursuant to a contract for $65,000.00 a year and that Delta breached that contract. The interpretation of a contract is a question of law. **Guiliano v. CLEO, Inc.**, 995 S.W.2d 88, 95 (Tenn. 1999). Therefore, the trial court's interpretation of a contractual document is not entitled to a presumption of correctness on appeal. **Angus v. Western Heritage Ins. Co.**, 48 S.W.3d 728, 730 (Tenn. Ct. App. 2000). However, the determination of whether a breach has occurred is a question of fact. **Carter v. Krueger**, 916 S.W.2d 932, 934-35 (Tenn. Ct. App.1995) ("This is a matter of fact which is properly addressed to the trier of fact."). With regard to this issue, the trial court found:

> 6. The Court finds that there was a contract of employment between Edmunds and Delta. Although the contract was terminable at will, the Court finds that is was not terminated until Edmunds left the employ of Delta in October 2008. . . .
> 7. The Court finds that Delta breached the employment contract with Edmunds by failing to pay Edmunds the $65,000.00 in annual salary owed to Edmunds under the terms of that employment contract.
> 8. From January 2006 through December 2006, Edmunds only received $3,800.00 as compensation despite the existence of the Contract.
> 9. From January 2007 through December 2007, Edmunds only received $21,250.00 as compensation despite the existence of the Contract.
> 10. From January 2006 through December 2006, Edmunds only received $43,081.48 as compensation despite the existence of the Contract.[2]
> 11. Edmunds rarely missed a day of work, reporting for work

[2] From our review of the record, it appears that the documentary and testamentary evidence in this case shows that Mr. Edmunds was paid $42,500.00 in 2008, rather than the $43,081.48 as found by the trial court. However, Mr. Edmunds does not take issue with the damages awarded to him pursuant to the contract. Therefore, we decline to address this error.

every day and working a full eight hour day.

12. Beginning in 2006, Garrison consistently promised Edmunds that he would pay Edmunds the money owed to him. Garrison and Edmunds' wife, Amy Edmunds, communicated via email in 2007 and 2008. . . . Garrison repeatedly promised to pay the monies owed to Edmunds. In reliance on these repeated promises and assurances, Mr. Edmunds continued to report to work and provide a direct benefit to Delta and Garrison. Edmunds trusted and believed that Garrison, the President and CEO of Delta, would make up the debt owed to him.

13. From August 2007 through July 2008, Edmunds received timely, consistent, and full payments based upon his salary of $65,000.00 per year.

\* \* \*

15. From January 2004 through October 2008, Edmunds reported to work as required, performed his duties in a reasonable manner, and executed all tasked assignments to him by Garrison. Edmunds was not disciplined or written up by anyone at Delta during the course of his employment.

16. Edmunds was never discharged or terminated by Garrison or Delta.

\* \* \*

19. Despite numerous requests for payment of the compensation owed to Edmunds pursuant to the Contract, Edmunds is still owed $116,034.52 through his resignation on October 31, 2008.

We have thoroughly reviewed the record in this case and conclude that the evidence does not preponderate against the trial court's finding that a valid employment contract existed, that the contract was not terminated until Mr. Edmunds' resignation in October 2008, and that the contract was breached by Delta when it failed to pay Mr. Edmunds as promised.

First, the evidence in the record fully support's the trial court's conclusion that Mr. Edmunds' employment was governed by an employment contract. In this case, both Mr. Edmunds and Mr. Garrison, as the representative of Delta, signed the employment document outlining the non-disclosure and non-compete requirements as well as the duties of Mr. Edmunds as the employee. This document refers to itself as an "agreement." Tennessee law

-8-

defines a contract as "[a]n *agreement* between two or more parties creating obligations that are enforceable or otherwise recognizable at law." *Green v. Jones*, No. E2011-02587-COA-R3CV, 2012 WL 2737803 (Tenn. Ct. App. July 10, 2012) (quoting Black's Law Dictionary (9th ed. 2009)). By the very terms of the document, then, Mr. Edmunds and Delta were entering into a contract of employment. Further, the contract provides that Delta will pay Mr. Edmunds $65,000.00 annually as consideration for his agreement to the terms of the non-disclosure and non-compete clauses. As consideration is an essential element to the formation of a contract, we conclude that the "agreement" at issue is speaking in terms of contract formation. *Campbell v. Matlock*, 749 S.W.2d 748, 751 (Tenn. Ct. App. 1987). In addition, the document states that the terms of the "agreement" can only be modified by mutual assent of the parties. Again, the document speaks in terms of contract law, as it is well-settled that a contract may only be modified by mutual assent. *Thompson v. Creswell Industrial Supply*, Inc., 936 S.W.2d 955, 957 (Tenn. Ct. App. 1996). Additionally, Delta now admits in its appellate brief that Mr. Edmunds' employment was governed by a contract. Accordingly, the evidence supports the trial court's finding that Mr. Edmunds' employment was governed by a contract.

However, in the trial court, Delta argued that, because the contract was for an indefinite term and provided that Mr. Edmunds could be terminated "at the sole discretion of Delta," Mr. Edmunds has no enforceable right to recover the compensation he was promised pursuant to the contract. It is true that Tennessee follows the "at-will" employment doctrine. At-will employment means that employment contracts of indefinite duration are terminable at the will of the employer or employee for any or no cause. *Guy v. Mut. of Omaha Ins. Co.*, 79 S.W.3d 528, 534-35 (Tenn. 2002). Thus, Mr. Edmunds had an expectation under the contract to be paid $65,000.00 per year so long as he performed his duties, unless and until his employment was terminated. Indeed, in his brief, Mr. Garrison now admits that the documents signed by the parties in 2004 constitute an enforceable contract, but argues that the contract was terminated in 2006 when Mr. Garrison allegedly informed Mr. Edmunds that there was no money from which to compensate Mr. Edmunds. The trial court, however, specifically found that Mr. Edmunds was never terminated from his employment. From our review of the record, we again conclude that the evidence does not preponderate against this finding.

Mr. Garrison admitted at trial that, while he informed Mr. Edmunds that there was no money to pay his salary beginning in 2006, he never specifically told Mr. Edmunds that his employment was terminated. There are no allegations that any other Delta employee had the authority to terminate Mr. Edmunds' employment or that they did so. In addition, Mr. Garrison admitted that he continued to allow Mr. Edmunds to come into work five days a week and perform tasks on behalf of Delta, never once telling Mr. Edmunds that he should not. Further, from our review of Mr. Garrison's email responses to Mrs. Edmunds, Mr. Garrison assured Mr. Edmunds and his wife that business was likely to pick up and that Mr.

Edmunds would again be paid. In promising that Delta would soon catch up on "back pay," Mr. Garrison clearly stated his intention that Mr. Edmunds receive back pay for work for which he was never paid. Accordingly, this evidence does not preponderate against a finding that Mr. Edmunds was to be paid for the entirety of his work with Delta and not just on weeks where there were projects to be performed. Thus, Mr. Garrison's own testimony tends to support the trial court's finding that Mr. Edmunds was never terminated and that he was promised full retroactive compensation for his work at Delta.

In addition, both Mr. Edmunds and his wife testified that Mr. Garrison, as the representative for Delta, repeatedly assured them that Mr. Edmunds would receive full back pay for his work and that Mr. Edmunds was still considered an employee of Delta until his resignation in October 2008. Mr. Edmunds even stated that Mr. Garrison was concerned about the tax consequences of receiving such a large amount of back pay in one lump sum. Mr. Garrison, however, disputes that he ever promised to pay "a total sum" to Mr. Edmunds. Instead, Mr. Garrison contends that while he did not specifically inform Mr. Edmunds that his employment was terminated, termination was "obvious" based on the circumstances, despite the fact that Mr. Garrison allowed Mr. Edmunds to come into work each day to perform tasks that benefitted the company and that Delta continued to pay Mr. Edmunds, albeit sporadically. Accordingly, we are faced with conflicting accounts of the events in this case. Thus, the issues in this case turn in part on the trial court's determination of the relative credibility of the witnesses. When the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge who has the opportunity to observe the manner and demeanor of the witnesses while testifying is in a far better position than this Court to decide those issues. ***In re Arteria H.***, 326 S.W.3d 167, 176 (Tenn. Ct. App. 2010) (citing ***McCaleb v. Saturn Corp***., 910 S.W.2d 412, 415 (Tenn. 1995)). If the trial court's factual determinations are based on its assessment of witness credibility, this Court will not reevaluate that assessment absent clear and convincing evidence to the contrary." ***Franklin County Bd. Of Educ. v. Crabtree***, 337 S.W.3d 808, 811 (Tenn. Ct. App. 2010) (citing ***Jones v. Garrett***, 92 S.W.3d 835, 838 (Tenn. 2002)). The trial court in this case did not make express credibility findings. However, a trial court's finding on credibility may be implied from the manner in which the trial court decided the case. ***Richards v. Liberty Mut. Ins. Co.***, 70 S.W.3d 729, 733 (Tenn. 2002). Clearly, in finding that the employment contract was not terminated by Delta at any time prior to Mr. Edmunds' October 2008 resignation, the trial court credited the testimony of Mr. Edmunds over the testimony of Mr. Garrison. Nothing in the record leads us to question Mr. Edmunds credibility or leads us to give greater weight to the testimony of Mr. Garrison. Instead, the weight of the evidence in the record supports a finding that Mr. Garrison did not terminate Mr. Edmunds, but continued to utilize his services for the benefit of Delta, and repeatedly assured Mr. Edmunds that Delta would compensate him for the work for which he had not been paid. Accordingly, we must conclude that the evidence does not preponderate against the trial court's finding that a valid, enforceable contract existed that was

not terminated by Delta prior to October 2008. Because it is undisputed that Delta failed to pay Mr. Edmunds pursuant to the contract, we affirm the trial court's finding that Delta breached the employment contract and is liable to Mr. Edmunds for the full amount of compensation he was owed under the contract from 2006 until his resignation in 2008.

In its appellate brief and at oral argument on this appeal, Delta argues that if the contract was not terminated in 2006, then the terms of the contract were modified in 2006 when Mr. Garrison informed Mr. Edmunds that there was no money to make payroll. Specifically, Delta argues that, by remaining with the company after the downturn in 2006, Mr. Edmunds agreed to work on a project-basis, only being paid for those weeks in which he worked on specific projects for Delta. At oral argument, counsel for Mr. Edmunds objected to this argument because it had not been asserted in the trial court. After reviewing the record in this case, it appears that Delta instead relied on the argument that the documents signed by Mr. Edmunds and Mr. Garrison in 2004 were not a contract or that Mr. Edmund's employment had been terminated, both of which have been discussed above. It is well-settled that issues are considered waived on appeal by the failure to present them at trial. *See **ABN AMRO Mortg. Group, Inc. v. Southern Sec. Federal Credit Union***, No. W2011-00693-COA-R3CV, 2011 WL 5590320, at \*4 (Tenn. Ct. App. Nov. 17, 2011) (citing ***Waters v. Farr***, 291 S.W.3d 873, 918 (Tenn. 2009)). In addition, "a party may not litigate an issue on one ground, abandon that ground post-trial, and assert a new basis or ground on appeal." ***State v. Leach***, 148 S.W.3d 42, 55 (Tenn. 2003). Having never been presented with this argument at the trial level, the trial court was unable to make a specific finding as to whether a modification took place in this case. Even assuming, *arguendo*, that this issue is properly raised on appeal, we conclude that the evidence preponderates in favor of a finding that the contract at issue was not modified in the manner argued by Delta. Instead, the evidence shows that Mr. Garrison repeatedly assured Mr. Edmunds that he owed him "a debt," that he would "catch[] up . . . the back pay," and that Mr. Garrison had "every intention of meeting my obligation to [Mr. Edmunds] whenever I can ***regardless***." (emphasis added). In addition, Mr. Garrison admitted that Mr. Edmunds had never agreed to work for no compensation, even though mutual assent to a modification was required by the terms of the employment contract. As such, we conclude that there was no modification of the contract with regard to Mr. Edmunds' rate of compensation.

### B. Pre-judgment Interest

Delta next argues that the trial court erred in awarding Mr. Edmunds prejudgment interest on the contract damages at a rate of seven percent per year. Regarding pre-judgment interest, this Court has stated:

> Parties who have been wrongfully deprived of money

have been damaged in two ways. First, they have been damaged because they have not received the money to which they are entitled. Second, they have been damaged because they have been deprived of the use of that money from the time they should have received it until the date of judgment. Awards of pre-judgment interest are intended to address the second type of damage. They are based on the recognition that a party is damaged by being forced to forego the use of its money over time. *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655–56, 103 S.Ct. 2058, 2062–63, 76 L.Ed.2d 211 (1983); *Mitchell v. Mitchell*, 876 S.W.2d 830, 832 (Tenn.1994). Thus, our courts have repeatedly recognized that prejudgment interest is awarded, not to punish the wrong-doer, but to compensate the wronged party for the loss of the use of the money it should have received earlier. *Myint v. Allstate Ins. Co.*, 970 S.W.2d at 927 . . . .

*Scholz v. S.B. International, Inc.*, 40 S.W .3d 78, 82 (Tenn. Ct. App. 2000) (string cite omitted). Thus, "the law in Tennessee favors awarding prejudgment interest whenever doing so will more fully compensate a successful plaintiff for the loss of use of money to which the plaintiff was legally entitled." *Lockett v. Charles Blalock & Sons, Inc.*, No. E2001-01000-COA-R3-CV, 2002 WL 111304, at *3 (Tenn. Ct. App. 2002) (citing *Scholz*, 40 S.W.3d at 82). However, Delta contends that an award of pre-judgment interest is inappropriate under the facts of this case. Specifically, Delta argues that, because Mr. Edmunds implicitly agreed to forego timely payment of the money by choosing to remain an employee of Delta, he should not be entitled to prejudgment interest. In addition, Delta argues that Mr. Edmunds cannot rely on the loans taken out by him and his wife, or Mr. Garrison's assurances via email that Mr. Edmunds would be compensated because Mr. Edmunds failed to explain to Mrs. Edmunds the true circumstances of the declining business.

The trial court's award of damages and award of prejudgment interest is reviewed under an abuse of discretion standard. *BankcorpSouth Bank, Inc. v. Hatchel*, 223 S.W.3d 223, 230 (Tenn. Ct. App. 2006); *Franklin Capital Assocs., L.P. v. Almost Family, Inc.*, 194 S.W.3d 392, 405 (Tenn. Ct. App. 2005). A trial court abuses its discretion only when it applies an incorrect legal standard or reaches a decision which is against logic or reasoning that causes an injustice to the party complaining. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)). If a discretionary decision is within a range of acceptable alternatives, we will not substitute our judgment for that of the trial court simply because we may have chosen a different alternative. *White v.. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999).

In this case, the trial court awarded pre-judgment interest to Mr. Edmunds based upon a finding that:

> The evidence showed that because Mr. Edmunds was not receiving his agreed-upon salary for 2006, 2007, and 2008, he was forced to take out a second mortgage on his home at a variable interest rate. He incurred additional costs because he did not have the benefit of the money he was to be paid at the time it was due, costs that a mere award of back pay will not remedy.

The evidence in the record does not preponderate against these findings. Indeed, the evidence was uncontroverted at trial that Mr. Edmunds and his wife suffered financially due to Delta's failure to pay Mr. Edmunds. In addition, the evidence shows that assurances were made that the business would pick up and Mr. Edmunds would be paid, which certainly would have induced Mr. Edmunds to stay with the company despite its financial struggles. Thus, we conclude that it was not an abuse of discretion for the trial court to award pre-judgment interest to Mr. Edmunds

Delta also argues that the trial court erred in awarding interest at a rate of seven percent because the last draw on the home equity line was at a rate of 2.75 percent. However, the evidence shows that the over seventy-five percent of the money drawn from the home equity line was at a rate between seven to nine percent. The awarded rate of seven percent is on the low end of this spectrum. Accordingly, we discern no abuse of discretion in the trial court's decision to award interest at a rate of seven percent.

### C. Alter-Ego

Mr. Garrison next argues that the trial court erred in finding that Delta was his alter-ego and that he should be personally responsible for the damages owed to Mr. Edmunds by Delta. Accordingly, this Court must determine whether there was sufficient evidence to justify piercing Delta's corporate veil to impose personal liability on Mr. Garrison. In this case, the trial court made the following findings with regard to this issue:

> 20. The Court finds that Delta and Garrison were alter-egos. Garrison admitted that for quite some time he has been the sole officer and manager of Delta. Garrison admitted that from 2006 forward Delta was essentially Garrison. When Delta ceased paying Edmunds in regular installments, Garrison and his wife owned 100% of Delta. Garrison was fully aware that Edmunds was working without pay for large portions of 2006, 2007, and

2008.

21. Garrison took personal responsibility for the monies owed to Edmunds. Garrison continued to promise Edmunds and his wife Amy that he would repay the debt owed to Edmunds. When Garrison made those promises, he spoke of obligations to Edmunds as personal obligations, not as obligations of Delta alone, describing not only his debt but also his "debt of gratitude" to Edmunds. Edmunds continued to report to work based upon his personal relationship with Garrison and Garrison's personal assurances that Edmunds eventually would be paid for all his work. Garrison was the only person who knew that Delta could not afford to pay Edmunds; however, instead of terminating Edmunds, Garrison continued to make promises that Edmunds would be repaid and continued to allow Edmunds to report to work on a daily basis.

Respectfully, and with due deference to the trial court's findings on this issue, we conclude that the evidence was insufficient to justify piercing the corporate veil and holding Mr. Garrison personally responsible for the liabilities of Delta.

This Court explained the doctrine of piercing the corporate veil in *VP Buildings, Inc. v. Polygon Group*, No. M2001-00613-COA-R3-CV, 2002 WL 15634, *4–5 (Tenn. Ct. App. January 8, 2002):

> Conditions under which the corporate entity will be disregarded vary according to the circumstances present in the case, and the matter is particularly within the province of the trial court. *Muroll Gesellschaft M.B.H. v. Tennessee Tape, Inc.*, 908 S.W.2d 211, 213 (Tenn. Ct. App. 1995) (citing *Electric Power Bd. of Chattanooga v. St. Joseph Valley Structural Steel Corp.*, 691 S.W.2d 522 (Tenn. 1985)); *Piper v. Andrews*, No. 01A01-9612-CV-00570, 1997 WL 772127, at *3 (Tenn. Ct. App. Dec. 17, 1997) (Perm. app. denied June 8, 1998). Thus, the question of when an individual should be held liable for corporate obligations is largely a factual one. "Each case involving disregard of the corporate entity must rest upon its special facts." *Muroll Gesellschaft*, 908 S.W.2d at 213; *Schlater v. Haynie*, 833 S.W.2d 919, 925 (Tenn. Ct. App. 1991).

* * *

There is a presumption that a corporation is a distinct legal entity, wholly separate and apart from its shareholders, officers, directors, or affiliated corporations. In an appropriate case and in furtherance of the ends of justice, the separate identity of a corporation may be discarded and the individual or individuals owning all its stock and assets will be treated as identical to the corporation. *Muroll Gesellschaft*, 908 S.W.2d at 213; *Schlater*, 833 S.W.2d at 925; *see also* *Fidelity Trust Co. v. Service Laundry Co.*, 160 Tenn. 57, 61, 22 S.W.2d 6, 7-8 (1929); *see generally* *E.O Bailey & Co. v. Union Planters Title Guar. Co.*, 33 Tenn.App. 439, 232 S.W.2d 309 (1950). Discarding the fiction of the corporate entity, or piercing the corporate veil, is appropriate when the corporation is liable for a debt but is without funds to pay the debt, and the lack of funds is due to some misconduct on the part of the officers and directors. *Muroll Gesellschaft*, 908 S.W.2d at 213; *S.E.A., Inc. v. Southside Leasing Co., et al.*, No. E2000-00631-COA-R3-CV, 2000 WL 1449852, at *9 (Tenn. Ct. App. Sept. 29, 2000) (no Tenn. R.App. P. 11 filed); *Emergicare Consultants, Inc. v. Woolbright*, No. W1998-00659-COA-R3-CV, 2000 WL 1897350, at *2 (Tenn. Ct. App. Dec. 29, 2000) (Perm. app. denied. May 14, 2001).

In those circumstances, courts may pierce the corporate veil to find the "true owners of the entity" liable, *Murroll Gesellschaft*, 908 S.W.2d at 213, or "to impose liability against a controlling shareholder who has used the corporate entity to avoid his legal obligations." *Manufacturers Consolidation Serv., Inc. v. Rodell*, 42 S.W.3d 846, 866 (Tenn. Ct. App. 2000). Our courts will disregard the corporation as a separate entity upon a showing that the corporation is a sham or dummy or such action is necessary to accomplish justice. Muroll *Gesellschaft*, 908 S.W.2d at 213; *Tennessee Racquetball Investors, Ltd. v. Bell*, 709 S.W.2d 617, 619 (Tenn. Ct. App. 1986); *Oak Ridge Auto Repair Serv. v. City Fin. Co.*, 57 Tenn.App. 707, 711, 425 S.W.2d 620, 622 (1967); Fidelity Trust Co., 160 Tenn. at 61, 22 S.W.2d at 7-8; *Emergicare Consultants, Inc.*, 2000 WL 1897350, at *2; *Piper*, 1997 WL 772127, at *3.

*VP Buildings*, 2002 WL 15634, at *4–5 (footnote omitted); *see also* *Boles v. National Development Co., Inc.*, 175 S.W.3d 226, 244–45 (Tenn. Ct. App. 2005) (citing favorably the analysis and discussion in *VP Buildings*).  The doctrine of piercing the corporate veil applies

equally to cases in which a party seeks to pierce the veil of a limited liability company, such as Delta:

> As a general rule, members, owners, employees or other agents of a Tennessee limited liability company have no personal liability for the debts or obligations of the company. *See* Tenn. Code Ann. § 48-217-101(a)(1); Tenn. Code Ann. § 48-249-114(a)(1)(B). Under an equitable remedy known as "piercing the corporate veil," however, "the separate legal entity of a corporation may be disregarded upon a showing that it is a sham or a dummy or where necessary to accomplish justice." *Schlater v. Haynie*, 833 S.W.2d 919, 925 (Tenn. Ct. App.1991). Despite the inapplicability of the remedy's name, the "corporate veil" of a Tennessee limited liability company may also be pierced, utilizing the same standards. *See Starnes Family Office, LLC v. McCullar*, 765 F.Supp.2d 1036, 1049 (W.D. Tenn. 2011).

*In re Steffner*, 479 B.R. 746, 755 (Bkrtcy. E.D. Tenn. 2012).

However, courts in Tennessee are cautioned that the doctrine of piercing the corporate veil should be applied only in " extreme circumstances to prevent the use of a corporate entity to defraud or perform illegal acts." *Pamperin v. Streamline Mfg., Inc.*, 276 S.W.3d 428, 437 (Tenn. Ct. App. 2008) (perm. app. denied Oct. 6, 2008). As this Court explained:

> "The principle of piercing the fiction of the corporate veil is to be applied with great caution and not precipitately, since there is a presumption of corporate regularity." *Schlater*, 833 S.W.2d at 925; *Emergicare Consultants, Inc.*, 2000 WL 1897350, at *2; *Lindsey, Bradley & Maloy v. Media Marketing Systems, Inc.*, No E200-00678-COA-R3-CV, 2000 WL 1875882, at *4 (Tenn. Ct. App. Dec. 15, 2000) (no Tenn. R. App. P. 11 filed). The party wishing to negate the existence of such separate entity has the burden of proving facts sufficient to justify piercing the corporate veil. *Schlater*, 833 S.W.2d at 925.

*VP Buildings*, 2002 WL 15634, at *5. When piercing the corporate veil, a court may disregard the corporate entity in order to impose liability against a related entity, such as a parent corporation or a controlling shareholder, where the two entities are in fact identical or indistinguishable and where necessary to accomplish justice. *Manufacturers Consol. Serv., Inc. v. Rodell*, 42 S.W.3d 846, 866 (Tenn. Ct. App.2000). In *Continental Bankers Life Ins.*

-16-

***Co. of the South v. The Bank of Alamo***, 578 S.W.2d 625 (Tenn. 1979), the Tennessee Supreme Court set forth three elements required to pierce the corporate veil as between a parent corporation and its subsidiary:

> 1) The parent corporation, at the time of the transaction complained of, exercises complete dominion over its subsidiary, not only of finances, but of policy and business practice in respect to the transaction under attack, so that the corporate entity, as to that transaction, had no separate mind, will or existence of its own.
> 2) Such control must have been used to commit fraud or wrong, to perpetuate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of third parties' rights.
> 3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

***Id.*** at 632. In this Court's subsequent decision in ***Tennessee Racquetball Investors, Ltd. v. Bell***, 709 S.W.2d 617(Tenn. Ct. App. 1986), we recognized that these elements are also required in an action to hold the individual owner of a corporation liable for the debts of the corporation under the alter ego theory. ***Id.*** at 622; *see, e.g.,* ***Island Brook Homeowners Ass'n, Inc. v. Aughenbaugh***, No. M2006-02317-COA-R3-CV, 2007 WL 2917781, at \*6 (Tenn. Ct. App. Oct. 5, 2007); ***Tennessee Racquetball Investors, Ltd. v. Bell***, 709 S.W.2d 617, 622 (Tenn. Ct. App. 1986); *but see* ***Schlater v. Haynie***, 833 S.W.2d 919, 925 (Tenn. Ct. App. 1991) (stating that ***Continental Bankers*** addressed parent/subsidiary relationships and was therefore inapplicable to the case before it involving a corporation/shareholder relationship).

The most common factors used by Tennessee courts to determine whether to pierce the corporate veil were originally set forth in ***Federal Deposit Ins. Corp. v. Allen***, 584 F.Supp. 386 (E.D. Tenn. 1984), as follows:

> Factors to be considered in determining whether to disregard the corporate veil include not only whether the entity has been used to work a fraud or injustice in contravention of public policy, but also: (1) whether there was a failure to collect paid in capital; (2) whether the corporation was grossly undercapitalized; (3) the nonissuance of stock certificates; (4) the sole ownership of stock by one individual; (5) the use of the same office or business location; (6) the employment of the same employees or attorneys; (7) the use of the corporation as an instrumentality or business

conduit for an individual or another corporation; (8) the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, or the manipulation of assets and liabilities in another; (9) the use of the corporation as a subterfuge in illegal transactions; (10) the formation and use of the corporation to transfer to it the existing liability of another person or entity; and (11) the failure to maintain arms length relationships among related entities.

*Id.* at 397 (citing cases from various jurisdictions); *see also Marshall v. Jackson*, No. M2007-01764-COA-R3-CV, 2008 WL 5156312, *6 (Tenn. Ct. App. Dec. 08, 2008) (citing the above factors and noting that they are commonly referred to as the *Allen* factors); *AmPharm, Inc. v. Eastland Pharmacy Services, L.L.C.*, No. M2006-01334-COA-R3-CV, 2008 WL 4830803, *6 (Tenn. Ct. App. Nov 5, 2008) (citing the *Allen* factors); *Altice v. NATS, Inc.*, No. M2007-00212-COA-R3-CV, 2008 WL 1744571, *2 (Tenn. Ct. App. Apr. 15, 2008) (same); *Dolle v. Fisher*, No. E2003-02356-COA-R3-CV, 2005 WL 2051288, *4 (Tenn. Ct. App. Aug. 26, 2005) (same); *Boles v. National Development Co., Inc.*, 175 S.W.3d 226, 245 (Tenn. Ct. App. 2005); *Oceanics Schools, Inc. v. Barbour*, 112 S.W.3d 135, 140 (Tenn. Ct. App. 2003) (same); *Emergicare Consultants, Inc. v. Woolbright*, No. W1998-00659-COA-R3-CV, 2000 WL 1897350, *2 (Tenn. Ct. App. Dec. 29, 2000) (same). Generally, no one factor is conclusive in determining whether to pierce the corporate veil; rather, courts will rely upon a combination of factors in deciding the issue. *Pamperin*, 276 S.W.3d at 438 (citing *Oceanics Schools*, 112 S.W.3d at 140). "Even though corporate formalities have been observed, one may still challenge the corporate entity by showing that he has been the victim of some basically unfair device by which the corporate form of business organization has been used to achieve an inequitable result." *Pamperin*, 276 S.W.3d at 438 (quoting *Schlater v. Haynie*, 833 S.W.2d 919, 925 (Tenn. Ct. App.1991)).

Mr. Edmunds relies on two factors, which he contends are sufficient to justify piercing the corporate veil. Mr. Edmunds first argues that the proof at trial showed that Mr. Garrison exercised complete dominion and control over Delta during the years at issue in this case. Indeed, Mr. Garrison admitted that Delta was "essentially" him from 2006 until the time of trial. *See Stark v Coker*, 20 Cal 2d 839, 129 P2d 390 (Cal. 1942) (considering, in a veil piercing case, evidence that the married couple who controlled the corporation stated that they were the corporation). We agree that the evidence in this case shows that Delta had "no separate mind, will or existence" apart from Mr. Garrison during the years at issue. *Pamperin*, 276 S.W.3d at 438 (quoting *Continental Bankers*, 578 S.W.2d at 632). However, the fact that a shareholder exercises complete dominion and control over a corporation alone is insufficient to justify piercing the corporate veil; the party seeking to pierce the corporate veil must also prove that "[s]uch control must have been used to commit fraud or wrong, to perpetuate the

violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of third parties' rights." **Pamperin**, 276 S.W.3d at 438 (quoting **Continental Bankers**, 578 S.W.2d at 632); *see also* **National Precast Crypt Co. v. Dy-Core of Pennsylvania, Inc.**, 785 F. Supp. 1186 (W.D. Pa. 1992) (holding that "the fact that one shareholder controlled a closely held corporation was not enough to support piercing the corporate veil"). To meet this prong of the analysis, Mr. Edmunds points out that Mr. Garrison made assurances to Mr. Edmunds and his wife that Mr. Edmunds would be paid his full compensation, despite his knowledge that Delta did not have the funds to pay Mr. Edmunds. Mr. Edmunds argues that these statements constitute personal assurances that impose liability on Mr. Garrison personally.

"A corporate officer . . . who personally guarantees an obligation may be personally liable for the performance of that particular obligation." 18 Am. Jur. 2d Corporations § 57. Indeed, some courts have pierced the corporate veil when the shareholder exercising control over the corporation made personal assurances that a debt would be paid. For example in **DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.**, 540 F.2d 681, 689 (4th Cir. 1976), the Fourth Circuit Court of Appeals, applying the substantive law of South Carolina, held that veil piercing was appropriate when the president of the defendant corporation stated that "he (i. e., [the president of the defendant corporation]) would take care of (the charges) personally, if the corporation failed to do so." *Id.* at 689. The president of the defendant corporation did not deny that he made this statement. The plaintiff company, who had entered into a service contract with the defendant corporation, contended that it continued to work for the defendant corporation in reliance on this assurance. The Court of Appeals concluded that this assurance was a factor strongly in favor of piercing the corporate veil:

> This assurance was given for the obvious purpose of promoting the individual advantage of [the president of the defendant corporation]. This follows because the only person who could profit from the continued operation of the corporation was [the president]. When one, who is the sole beneficiary of a corporation's operations and who dominates it, as did [the president] in this case, induces a creditor to extend credit to the corporation on such an assurance as given here, that fact has been considered by many authorities sufficient basis for piercing the corporate veil. **Weisser v. Mursam Shoe Corporation** (2d Cir. 1942), 127 F.2d 344, 145 A.L.R. 467; **Quaid v. Ratkowsky** (1918), 183 A.D. 428, 170 N.Y.S. 812, aff'd, 224 N.Y. 624, 121 N.E. 887.

*Id.* Other cases have come to similar conclusions. *See* **Weisser v Mursam Shoe Corp.**, 127

F2d 344 (2d Cir. 1942) (concluding that issue of fact existed as to whether piercing the corporate veil was appropriate when one of two shareholders of a company paid the first payment on the disputed lease with a personal check); *Stark v Coker*, 20 Cal.2d 839, 129 P.2d 390 (Cal. 1942) (piecing the corporate veil when the married couple who controlled the corporation stated that they were the corporation and made personal assurances as to their obligation under the notes at issue); *Claremont Press Publishing Co. v Barksdale*, 187 Cal.App. 2d 813, 10 Cal Rptr 214 (Cal. Ct. App. 1960) (holding that veil piercing was appropriate when there was evidence, disputed by the defendant, that he agreed to be responsible for the debts of the insolvent corporation); *Saxton v. Luke*, 296 S.E.2d 751, 752 (Ga. Ct. App. 1982) (holding shareholder liable on the contract at issue when, among other factors, he "gave his personal guarantee that the project would be completed, even if he had to pay for it out of his own pocket"). However, some courts have concluded that personal assurances on the part of a controlling shareholder do not justify piercing the corporate veil in order to hold the shareholder personally liable for the debts of the corporation. *See Anderson v. Dailey*, 25 Colo.App. 175, 136 P. 461 (Col. Ct. App. 1913) (holding that assurances by an officer and shareholder of a corporation in charge of its operations to its employees that it would be able to pay them did not create any personal liability against him); *Intelnet Intern. Corp. v. ITT Corp.*, No. A-6974-03T1, 2006 WL 2192030 (N.J. Super. Aug. 4, 2006) (concluding that veil piercing was not justified despite assurances by vice president of company that company would honor the contracts of its subsidiary).

Other courts have held that assurances will not be deemed sufficient to justify piercing the corporate veil when there is no evidence that the assurances were indeed personal assurances, rather than assurances as an agent of the corporation. For example in *Hester Enterprises, Inc. v. Narvais*, 402 S.E.2d 333, 335 (Ga. Ct. App. 1991), the Georgia Court of Appeals concluded that piercing the corporate veil was inappropriate in a case in which it was merely "speculation" that the shareholder's assurance were personal, rather than merely on behalf of the corporation. The Court explained:

> There is evidence that, at the closing, [the shareholder] guaranteed performance of a new agreement whereby a central air conditioning system would be installed in appellees' home. However, standing alone, such an assurance in no way implies that [the shareholder] was not merely guaranteeing that the Corporation, of which he was an officer, would perform this new agreement. "[T]here is no evidence short of speculation that [the shareholder] was acting in an individual capacity whereas in apposition, the records show [appellees were] aware by [all relevant] written documents that [the shareholder] was acting only in a representative capacity. []" *Earnest v. Merck*, [] 358

-20-

S.E.2d 661[, 273 (Ga. Ct. App. 1987)].

*Hester*, 402 S.E.2d at 335; *see also* ***Western Broadcasting Co. of Columbus v. Barrington***, 306 S.E.2d 320, 322 (Ga. Ct. App. 1983) (holding that piercing the corporate veil was inappropriate when the plaintiff failed to show that the statements made were assurances of personal liability); ***Menchio v. Rymer***, 348 S.E.2d 76 (Ga. Ct. App. 1986) (reversing judgment allowing plaintiffs to pierce corporate veil when co-plaintiff admitted that she had dealt with corporation rather than with its president personally).

We have thoroughly reviewed the record in this case and conclude that the evidence preponderates against the finding that the assurances at issue were personal assurances on the part of Mr. Garrison rather than assurances on the part of the corporation. Indeed, Mr. Garrison never specifically states that the obligation to pay back pay is his personally. In his September 7, 2007 email, Mr. Garrison explains that he will pay Mr. Edmunds when one of the client's pays its' bill to Delta. In his August 15, 2011 email, Mr. Garrison again conditions payment to Mr. Edmunds on the money flowing to the corporation, stating that "when payments come in, I will pay whatever I can[,] but I can do little to affect some clients['] payment cycles." Based on the evidence in the record, we cannot conclude that Mr. Edmunds has met his burden to prove that the assurances in this case represent an action on the part of Mr. Garrison to take personal responsibility for the debt. Instead, the record shows that Mr. Garrison qualified his assurances that Mr. Edmunds would receive compensation when Delta had the money to pay it. As previously discussed, Mr. Edmunds bears the burden to prove the circumstances which justify piercing the corporate veil in this case. See ***Schlater v. Haynie***, 833 S.W.2d 919, 925 (Tenn. Ct. App.1991). From our review of the record, Mr. Edmunds simply has not met his burden to show that the assurances at issue were personal to Mr. Garrison, rather than simply assurances on behalf of the corporate entity.

Other than his argument about personal assurances and Mr. Garrison's concession that he had complete control over the corporation, Mr. Edmunds offers no other facts which tend to show that "[s]uch control must have been used to commit fraud or wrong, to perpetuate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of third parties' rights." ***Pamperin***, 276 S.W.3d at 438 (quoting ***Continental Bankers***, 578 S.W.2d at 632). Indeed, after thoroughly reviewing the record in this case we conclude that the ***Allen*** factors do not weigh in favor of piercing the corporate veil in this case. ***Federal Deposit Ins. Corp. v. Allen***, 584 F.Supp. 386, 397 (E.D. Tenn. 1984). Specifically, there is no evidence in the record that (1) there was a failure to collect paid in capital; (2) the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, or the manipulation of assets and liabilities in another; (3) the use of the corporation as a subterfuge in illegal transactions; of (4) the formation and use of the corporation to transfer to it the existing liability of another person or entity. Although it is true

that Delta is likely unable to pay its debt to Mr. Edmunds, there is simply no evidence in the record as to its initial capitalization. Moreover, "[a] corporate entity may not be disregarded simply because it stands as a bar to a litigant's recovery of property." 18 Am. Jur. 2d Corporations § 47. In addition, while it is clear that the corporation was operated out of Mr. Garrison's home and Mr. Garrison held exclusive control over the corporation, as previously discussed, those facts alone are insufficient to justify piercing the corporate veil.

Accordingly, the circumstances in this case fail to rise to the level of other Tennessee cases in which this Court has concluded that piercing the corporate veil was appropriate. Many cases have found that piercing the corporate veil was warranted when the assets of the corporation were transferred to the shareholder for his or her own personal benefit, which transfer defeated the claims of creditors. For example, in *Pamperin v. Streamline Mfg., Inc.*, 276 S.W.3d 428 (Tenn. Ct. App. 2008) (perm. app. denied Oct. 6, 2008), this Court found evidence sufficient to pierce the corporate veil as to one shareholder when assets of the corporation were improperly distributed to the shareholder "for his own personal benefit, to the detriment of [the corporation] and its creditors." *Id.* at 439–40. In another case, *Oceanics Schools, Inc. v. Barbour*, 112 S.W.3d 135, 140 (Tenn. Ct. App. 2003), the Court concluded that piercing the corporate veil was likewise appropriate when the shareholder sold the principal asset of the corporation and transferred the proceeds from the sale to his personal account, which rendered the corporation without assets to pay debts. *Id.* at 141–42. In this case, however, there is no evidence that Mr. Garrison improperly distributed corporate assets to himself. Indeed, Mr. Garrison's uncontroverted testimony at trial was that he was receiving no salary and no profits from Delta during its financial struggles.

In other cases, piercing the corporate veil was  justified by the shareholder's failure to observe corporate formalities. In *VP Buildings, Inc. v. Polygon Group*, No. M2001-00613-COA-R3-CV, 2002 WL 15634 (Tenn. Ct. App. January 8, 2002), this Court pierced the corporate veil when the sole shareholder operated business in Tennessee despite the fact that the corporation failed to obtain the required certificate of authority. Additionally,  the sole shareholder failed to file required annual reports, which resulted in administrative dissolution of the corporation. In fact, the sole shareholder did not attempt to have the corporation reinstated until she was personally sued in the case. *Id.* at *6. In addition, the sole shareholder paid herself and her husband large sums of money even while the corporation was experiencing financial difficulties. *Id.*; *see also Dolle v. Fisher*, No. E2003-02356-COA-R3-CV, 2005 WL 2051288, *4 (Tenn. Ct. App. Aug. 26, 2005) (piercing the corporate veil when the corporation "simply functioned as [the sole shareholder's] private bank account which he utilized as he wished").  Finally, the evidence showed that once the corporation was sued, the sole shareholder encumbered its only asset, effectively preventing the plaintiffs from satisfying their judgment.  *VP Buildings*, 2002 WL 15634 at *7. In this case, however, there was no evidence that Mr. Garrison failed to observe corporate formalities. In fact, Mr.

Garrison testified that he continued to file annual reports for the corporation even after it was effectively dissolved because there was one project remaining to be completed. In addition, as discussed above, the undisputed evidence at trial was that Mr. Garrison received little to no income from the corporation during the period at issue. Finally, nothing in the record suggests any action on the part of Mr. Garrison to intentionally defeat Mr. Edmunds' claim; instead, from our review of the record, it appears that Mr. Garrison disclosed Delta's financial struggles and its lack of capital to Mr. Edmunds and his wife well before the litigation in this case commenced.

Instead, the facts in this case most closely resemble the facts in ***Money & Tax Help, Inc. v. Moody***, 180 S.W.3d 561 (Tenn. Ct. App. 2005), wherein the Court of Appeals reversed the decision of the trial court piercing the corporate veil and finding the owner personally liable. In declining to pierce the corporate veil, the ***Moody*** Court noted that "there was very little evidence presented to the trial court regarding [the corporation] or the way [the owner] operated it." ***Id.*** at 567. Indeed, the Court concluded that the only evidence presented regarding the operation of the corporation was the owner's admission that he was the sole shareholder and officer of the corporation. The Court further noted that there was "no allegation of fraud or misuse of the corporate form, nor [wa]s there any evidence regarding the record keeping practices of [the corporation]." In addition, the agreements under which the plaintiffs brought suit were signed by the owner in his capacity as president of the corporation, and all documents evinced that the corporation, rather than the owner, was the contracting party. Likewise in this case, there was little evidence of the operation of Delta other than Mr. Garrison's admission that he was the sole shareholder and officer and that Delta was "essentially [him]." In addition, there are no specific allegations that Mr. Garrison perpetrated a fraud, misused the corporate form, or that he kept improper records. Finally, Mr. Garrison likewise signed the employment contract in this case in his capacity as President and CEO of Delta and the contract clearly states that in consideration for Mr. Edmunds' work, "the Company [i.e. Delta] agrees to pay the Employee [i.e. Mr. Edmunds] a salary outlined in the Employee Offer Letter." Although we are sympathetic with Mr. Edmunds' situation, we recognize that piercing the corporate veil is an "extreme" remedy. ***Pamperin***, 276 S.W.3d at 438. Without more evidence tending to show that Mr. Garrison used the corporate entity to "commit fraud or wrong, to perpetuate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of third parties' rights," we must, like the Court in ***Moody***, decline to apply the doctrine in this case. ***Pamperin***, 276 S.W.3d at 438 (quoting ***Continental Bankers***, 578 S.W.2d at 632).

### D. Fair Labor Standards Act

Finally, Delta and Mr. Garrison argue that the trial court erred in finding them liable under the Fair Labor Standards Act, 29 U.S.C. § 201 *et. seq.*("the FLSA"). The FLSA

provides that workers engaged in "commerce" as defined under the statute, are required to be paid a minimum wage:

> Employees engaged in commerce; home workers in Puerto Rico and Virgin Islands; employees in American Samoa; seamen on American vessels; agricultural employees
> Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the following rates:
>
> (1) except as otherwise provided in this section, not less than--
> (A) $5.85 an hour, beginning on the 60th day after May 25, 2007;
> (B) $6.55 an hour, beginning 12 months after that 60th day; and
> (C) $7.25 an hour, beginning 24 months after that 60th day; . . .

29 U.S.C. § 206(a). The FLSA further provides a cause of action for an employee for unpaid minimum wages:

> Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages. . . . An action to recover the liability prescribed [above] may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. . . . The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action.

29 U.S.C. § 216(b). Mr. Edmunds was undisputedly employed with Delta pursuant to a contract in which he was to be paid a salary, rather than compensated hourly. However, that fact alone does not prevent him from bringing a claim pursuant to the FLSA. For example, in the highly analogous case of ***Orton v. Johnny's Lunch Franchise, L.L.C.,*** 668 F.3d 843 (6th Cir. 2012), the plaintiff, who was a salaried employee, brought a claim pursuant to the FLSA after the defendant employer reduced his pay due to the company's decreased cash

flow. The district court dismissed the case. The Sixth Circuit Court of Appeals reversed the decision of the district court, holding that the plaintiff had made out a proper claim under the FLSA, despite being a salaried employee. According to the Court:

> The new (2004) regulations . . . establish that employment agreements are no longer the relevant starting point for whether an employee is paid on a salary basis. ***Baden–Winterwood*** [ ***v. Life Time Fitness, Inc.***], 566 F.3d [618,] 627 [(6th Cir. 2009)]. The question is therefore not what [the [plaintiff] was owed under his employment agreement; rather, the question is what compensation [the plaintiff] actually received.

***Orton***, 668 F.3d at 848. The Sixth Circuit went on to conclude that despite the plaintiff's salary agreement with the employer, he was entitled to pursue an action for unpaid minimum wages pursuant to the FLSA, so long as he was not exempt from the FLSA. Thus, the salary of an employee is only relevant when there is an allegation that the employee at issue is exempt from the provisions of the FLSA.

An employer may raise a plaintiff's status as an exempt employee as an affirmative defense to claims brought under the FLSA. ***Thomas v. Speedway SuperAmerica, L.L.C.***, 506 F.3d 496, 501 (6th Cir. 2007). Exemptions, however, "'are to be narrowly construed against the employers seeking to assert them.'" ***Id.*** (quoting ***Arnold v. Ben Kanowsky, Inc.***, 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960)). The employer bears the burden of establishing the affirmative defense by a preponderance of the evidence, and the employer satisfies this burden only by providing "clear and affirmative evidence that the employee meets every requirement of an exemption." ***Thomas***, 506 F.3d at 501 (internal quotation marks omitted). Because the district court in ***Orton*** failed to place the burden to establish the plaintiff's exemption on the employer, the Court of Appeals reversed the judgment of dismissal. ***Orton***, 668 F.3d at 848–49. The Court further held that the plaintiff's allegation that the reduction in his salary was due to the company's cash flow problems did not prevent application of the FLSA, stating that "[t]he regulation makes no exception for deductions in pay just because they were motivated by cash flow shortages," and advising that the employer was free to negotiate a mutually agreeable reduction in salary with the employee. ***Id.*** at 849.

In this case, Delta and Mr. Garrison argued in the trial court that Mr. Edmunds was an exempt employee pursuant to 29 U.S.C. § 213(a)(1) (regarding "executive, administrative, or professional" employees), and (2) (regarding "computer systems analyst[s], computer programmer[s], software engineer[s], or other similarly skilled worker[s]"). However, the trial court specifically found that these exemptions did not apply to Mr. Edmunds. Neither Delta nor Mr. Garrison raised any argument or cited any authority on this issue in their

-25-

appellate brief or at oral argument. Tennessee Rule of Appellate Procedure 13(b) provides that appellate review will generally only extend to those issues presented for review. Although an issue may have been presented at trial, "a party's failure to brief it ordinarily constitutes waiver or abandonment of the issue." *Mosby v. Colson*, No. W2006-00490-COA-R3-CV, 2006 WL 2354763, at \*10 (Tenn. Ct. App. August 14, 2006) (other citations omitted); *see also Newcomb v. Kohler Co.*, 222 S.W.3d 368, 401 (Tenn. Ct. App. 2006) (failure "to cite to any authority or to construct an argument regarding [a] position on appeal" constitutes a waiver of the issue); *Bean v. Bean*, 40 S.W.3d 52, 55–56 (Tenn. Ct. App. 2000) ("Courts have routinely held that the failure to make appropriate references to the record and to cite relevant authority in the argument section of the brief as required by Rule 27(a)(7) constitutes a waiver of the issue."). Thus, the issue of whether Mr. Edmunds was exempt from the provisions of the FLSA is waived and this Court can proceed to consider the merits of Mr. Edmunds' claim.

As discussed above, the trial court found that Mr. Edmunds was an employee of Delta, engaged in commerce, and awarded him damages pursuant to the FLSA. On appeal, however, Delta and Mr. Garrison argue that Mr. Edmunds was not an "employee" for purposes of the Act on weeks when he was not paid. The FLSA provides that an "the term 'employee' means any individual employed by an employer." 29 U.S.C. § 203(e)(1). Delta argues that Mr. Edmunds was not "employed by Delta" because he was terminated in 2006 and that his efforts on behalf of Delta were merely "an ongoing application for a job." However, the trial court specifically found that Mr. Edmunds' employment with Delta was never terminated and we have found that the evidence does not preponderate against that finding. Thus, Mr. Edmunds was an "employee" for purposes of the FLSA until his resignation in October 2008.

Next, Delta argues that Mr. Edmunds was paid for all weeks in which he engaged in activities covered by the FLSA. As previously discussed, the FLSA only applies to those employees that engage in commerce, or some activity related to commerce. *See* 29 U.S.C. § 206(a). The FLSA defines commerce as "trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof." 29 U.S.C.A. § 203(b). The trial court specifically found that Delta and Mr. Edmunds were engaged in commerce during all workweeks in which Mr. Edmunds was not paid, stating:

> 27. Delta worked all across the United States. The evidence showed that Delta had projects in California, Kentucky, Alabama, and Arkansas. Delta made sales calls in Indiana and Michigan. Delta had employees that lived outside of the state of Tennessee. Delta received and sent mail to individuals and corporations that were based outside of Tennessee. Delta received and initiated telephone calls to individuals and entities

located outside of the state of Tennessee. Delta was engaged in interstate commerce.

28. Edmunds was also engaged in interstate commerce in his work for Delta and Garrison. Edmunds communicated by telephone and electronic mail with Delta employees, subcontractors, and clients that were based outside of the state of Tennessee. Edmunds inputted data into Delta programs that originated from Delta employees and subcontractors that were located outside of the state of Tennessee. Edmunds opened mail that originated outside of the state of Tennessee and sent mail that was going outside of the state of Tennessee.

We conclude that the evidence does not preponderate against the trial court's findings on this issue. Mr. Edmunds testified that, throughout his time with Delta, he performed several functions, including answering the phones and inputting the data regarding out of state employees. Even Mr. Garrison admitted that Delta had contact, either personally or over the phone, with various out of state clients throughout the time period at issue, but contends that Delta did not do a "a penny of business" with those clients. Respectfully, a portion of Delta's business was spent soliciting clients, without which Delta would have had no business. Accordingly, we fail to see a distinction between communications involving current clients and communications involving potential clients. Both types of communications were made on behalf of Delta in furtherance of its business purposes. The definition of "commerce" under the FLSA makes no requirement that the communications result in some type of financial benefit to one party. *See* 29 U.S.C.A. § 203(b).

Delta also makes much of the fact that Mr. Edmunds could not identify with any particularity his activities on any given week. The trial in this case took place in 2011, nearly three years since Mr. Edmunds resigned from his position with Delta. Tennessee law recognizes that witnesses' memories may "be dimmed by the passage of time." ***Waddle v. Elrod***, 367 S.W.3d 217, 223 (Tenn. 2012). Despite the gap between the events at issue and the trial in this case, from our review of the evidence, Mr. Edmunds clearly testified that he was engaging in commerce every week that he worked for Delta. While Mr. Garrison attempted to rebut that contention with his testimony, Mr. Garrison admitted that Delta had dealings with out of state employees and companies throughout the period of time at issue. Indeed, in his September 7, 2007 email, Mr. Garrison refers to employees working at Tiffen Motorhomes, located in Alabama. In another email, Mr. Garrison admits that Troy Locklin, who lived in Alabama, was still employed with Delta as late as August 2008. It is undisputed that throughout his tenure with Delta, Mr. Edmunds would input the data regarding the timesheets he received from of all Delta employees, including those that lived or worked out of state. Accordingly, the evidence does not preponderate against the trial court's finding that

Mr. Edmunds was an employee of Delta and Mr. Garrison,[3] and engaged in commerce, for all the weeks he was not paid in 2006, 2007, and 2008.[4]

## V. Conclusion

The judgment of the Circuit Court of Robertson County is affirmed in part, reversed in part, and remanded for all further proceedings as may be necessary and are consistent with this opinion. Costs of this appeal are taxed to Appellant Delta Partners, L.L.C., and its surety.

_____
J. STEVEN STAFFORD, JUDGE

---

[3] The trial court found Mr. Garrison jointly and severally liable for damages pursuant to the FLSA because he was the "employer" of Mr. Edmunds. Indeed, "[t]he overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." *Donovan v. Agnew*, 712 F.2d 1509, 1511 (1st Cir. 1983). Mr. Garrison does not appeal this ruling.

[4] The statute of limitation on a claim pursuant to the FLSA is two years from when the cause of action accrued. 29 U.S.C. § 255 (a). However, the statute contains an exception "that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." *Id.*; *see also McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988) (requiring that the plaintiff show "that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute" to prove willfulness and trigger the three-year statute of limitation). There is no dispute that Mr. Edmunds' claim pursuant to the FLSA was timely added to this case by the filing of an amendment to the original complaint. *See* Tenn. R. Civ. P. 15. The trial court in this case, however, made conflicting findings as to whether Delta and Mr. Garrison's violation in this case was willful, allowing Mr. Edmunds to recover lost minimum wages for the third year, from January 22, 2006 to January 22, 2007. First, the trial court found that Delta's failure to pay was not willful, then later concluded that the failure was willful. Ultimately, though, the trial court awarded damages only for two years of unpaid minimum wages as a set off to the contract damages. Neither party takes issue with this ruling by the trial court; therefore, we will not disturb it on appeal.